# EXHIBIT 4

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

COMPLEX LITIGATION DIVISION

MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

          Plaintiff,

vs.

                                   Case No.:

MIAMI MARLINS, L.P., a Delaware limited
partnership registered to conduct business in
the State of Florida, and MARLINS TEAMCO
LLC, a Delaware limited liability company
registered to conduct business in the State of
Florida,

          Defendants.

_____/

## COMPLAINT

Plaintiff Miami-Dade County (the "County") sues Defendants Miami Marlins, L.P. (the former owner of the Miami Marlins) and Marlins TeamCo, LLC (the new owner of the Miami Marlins) (collectively, the "Marlins" or "Defendants"). This action arises from the Marlins' refusal to pay the County and the City of Miami (the "City") the 5% equity participation (the "Equity Payment") that the Marlins promised to pay upon a sale of the Major League Baseball franchise known as the Miami Marlins (the "Team"). The sale occurred in October 2017.[1] Despite purchasing the Team for $158.5 Million and selling it for $1.2 **Billion**, the Marlins recently provided the County with a vague valuation schedule contending that no proceeds are available to

---

[1] Pursuant to an Assignment and Assumption Agreement, Marlins TeamCo has contractually assumed the obligations of the Loria Marlins under the Non-Relocation Agreement.

satisfy the Equity Payment obligation. The Marlins also failed to provide the "detailed calculation" from "independent accountants" that they were contractually obligated to provide, leaving the County unable to determine whether and how the Marlins improperly inflated deductions and other expenses to claim an Equity Payment obligation of $0, despite a ***757%*** increase in the Team's market price.

The County brings this action for violations of the False Claims Act and the Florida Deceptive and Unfair Trade Practices Act, and for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory and injunctive relief.

### Jurisdiction and Venue

1.      This is an action for legal and equitable relief.

2.      The County's damages exceed $750,000, as alleged below.

3.      The County is a political subdivision of the State of Florida.

4.       Pursuant to Florida Statute § 48.193, this Court has jurisdiction over the Marlins because they, among other things, have transacted business within the State or breached contracts in this State by failing to perform acts required to be performed in this State.

5.      The Non-Relocation Agreement ("Non-Relocation Agreement") executed between the Marlins, on the one hand, and the County and the City, on the other hand, entitles the County to seek redress for the Marlins' breaches in any court of competent jurisdiction:

> In the event of any breach of or misrepresentation in this Agreement by the Team … the County and the City shall have the right (i) to institute any and all proceedings or claims permitted by law or equity to recover any and all amounts necessary to compensate the County and the City for all damages proximately caused by the Team's breach under this Agreement, and (ii) to institute any and all proceedings or claims permitted by law or equity to compel specific performance with respect to the Team's obligations under this Agreement and one or more actions to seek and obtain a temporary restraining order, together with such other temporary, preliminary and permanent injunctive or other equitable relief, from any **court of competent jurisdiction** capable of issuing or granting such relief, to

compel the Team to comply with or refrain or cease from breaching or violating the terms, covenants and conditions of this Agreement.

Non-Relocation Agreement § 5.4[2] (Emphasis added). A copy of the Non-Relocation Agreement is attached as **Exhibit A**.

6.     Pursuant to Florida Statutes § 47.011, venue is appropriate in this Court because the Marlins reside in this County or the causes of action accrued in this County.

## Parties and Affiliated Entities/Persons

7.     Defendant Miami Marlins, L.P. (formerly Florida Marlins, L.P.) is a Delaware limited partnership ultimately owned by Jeffrey Loria (the "Loria Marlins"), which has its principal place of business at the Marlins Park Baseball Stadium, 501 Marlins Way, Miami, FL 33125 (the "Stadium"). Until approximately October 2, 2017, the Loria Marlins owned the Team.

8.     Double Play Company is a foreign corporation also owned by Jeffrey Loria ("Loria's Double Play"). Its principal office was also at the Stadium during the time that the Loria Marlins owned the Team. Loria's Double Play is the Managing General Partner of the Loria Marlins.

9.     Defendant Marlins TeamCo, LLC is a Delaware Limited Liability Company with its principal place of business also located at the Stadium. Marlins TeamCo purchased the Team from the Loria Marlins on October 2, 2017. Pursuant to an Assignment and Assumption Agreement, Marlins TeamCo has contractually assumed the obligations of the Loria Marlins under the Non-Relocation Agreement. A copy of the Assignment and Assumption Agreement ("Assumption Agreement") is attached hereto as **Exhibit B**.

---

[2] "Team" is defined, for purposes of the Non-Relocation Agreement, as "Florida Marlins, L.P.," expressly including its assigns and successors. Under the Assumption Agreement, the Marlins TeamCo is the successor and assignee.

**Factual Allegations**

10.     Prior to 2009, the Loria Marlins publicly threatened that, if they did not receive public funding for the construction of a new stadium, they would relocate the Team outside of the County.

11.     During this period, the Loria Marlins also maintained that they were not profitable and, thus, could not fund the construction of a new stadium without public funding.

12.     In exchange for the promises to keep the Team in the County for a specified period of time, and to make the Equity Payment to the County if the Loria Marlins sold the Team within a specified period of time, the County agreed to provide, among other things, approximately $389 Million toward the construction of the Stadium (including the public infrastructure), while the City agreed to provide, among other things, approximately $25 Million and the land for the stadium. Those promises were memorialized in a series of agreements – including the Non-Relocation Agreement – between the Loria Marlins, its affiliated entities, the City, and the County.

13.     The parties executed the Non-Relocation Agreement in April 2009 in connection with other agreements spelling out the terms of the entire transaction between the Loria Marlins, the County, and the City.

14.     The Non-Relocation Agreement provides, in relevant part, that:

> Upon the sale to a third party…the Team shall or shall cause the seller to pay to the County and the City, to be split on a pro-rata basis … an amount equal to the following percentage of the Net Proceeds of the sale that are attributable to any increase in value of the franchise … (the "County/City Equity Payment")….

OFFICE OF COUNTY ATTORNEY, MIAMI-DADE COUNTY, FLORIDA
TELEPHONE 305.375.5151

| Phase of Project | Year | Description of Time-Frame | Percentage |
|---|---|---|---|
| Construction Phase | Year 1 | If sale occurs within 12 months of approval date of Stadium Agreements | 70% |
| Construction Phase | Year 2 | Sale occurs within 24 months of approval date of Stadium Agreements | 60% |
| Construction Phase | Year 3 | Sale occurs within 36 months of approval date of Stadium Agreements | 50% |
| Construction Phase | Year 4 | Sale occurs within 48 months of approval date of Stadium Agreements, or, prior to Substantial Completion of Stadium, whichever occurs first | 30% |
| Operational Phase | Year 1 | Sale occurs within 12 months of Substantial Completion | 10.0% |
| Operational Phase | Year 2 | Sale occurs within 24 months of Substantial Completion | 7.5% |
| Operational Phase | Year 3 | Sale occurs within 36 months of Substantial Completion | 5.0% |
| Operational Phase | Year 4 | Sale occurs within 48 months of Substantial Completion | 5.0% |
| Operational Phase | Year 5 | Sale occurs within 60 months of Substantial Completion | 5.0% |
| Operational Phase | Year 6 | Sale occurs within 72 months of Substantial Completion | 3.0% |

The increase in value shall be based on an assumed value of the franchise of $250,000,000 as of the date of the BSA,[3] which assumed value shall be increased to give effect to any additional debt incurred by, or equity capital contributions made to the Team, Stadium Developer or Operator, including the capital contributions made to, or the debt incurred by, the Stadium Developer or the Team pursuant to the Construction Administration Agreement (net of distributions to any such Team owners) and an imputed increase in value of 8% per annum from the date of the BSA. "Net Proceeds" shall mean the fair market value of all proceeds received from the sale plus any indebtedness for borrowed money of the Team or any Team Affiliate assumed by the buyer in the sale, less (x) the assumed value of the franchise determined under the preceding sentence, (y) all transaction-related expenses and taxes payable by the Team Affiliates and/or their direct and indirect owners to unaffiliated third parties solely as a result of the sale, and (z) any liabilities or obligations retained by the Team (in the case of a sale of the franchise) and/or its direct or indirect owners relating to the Marlins or its affiliated businesses.

Non-Relocation Agreement § 6 (the "Equity Payment Clause").

---

[3] "BSA" refers to the Baseball Stadium Agreement, which was the preliminary agreement that contemplated the various other agreements spelling out the terms of the entire transaction between the Loria Marlins, the County, and the City. The BSA was executed on February 21, 2008.

OFFICE OF COUNTY ATTORNEY, MIAMI-DADE COUNTY, FLORIDA
TELEPHONE 305.375.5151

15. The Loria Marlins sold the Team in "Year 6" of the "Operational Phase." Thus, based on the Equity Payment Clause table, the Marlins owe an Equity Payment of 5%.

16. The responsibility for making the Equity Payment rests with the ***Team's owner*** (i.e., the new owner, Marlins TeamCo). Marlins TeamCo, thus, had the option of either making the Equity Payment itself, or of causing the Loria Marlins to make the Equity Payment. *See* Equity Payment Clause ("Upon a sale…, the Team shall or shall cause the seller [meaning the Loria Marlins] to pay to the County and the City … the 'County/City Equity Payment.'").

17. The Equity Payment Clause also obligated the ***Team's owner*** (i.e., the new owner, Marlins TeamCo) to provide the County, "as promptly as practicable" following a sale, with a "***detailed calculation***" performed by "***independent accountants***" showing the Equity Payment that is contractually owed:

> The **Team** shall cause its **independent accountants** to provide the County and City a reasonably detailed calculation of the County/City Equity Payment (on a combined basis) under this Section 6, ***including a detailed calculation showing the assumed value, Net Proceeds and any other calculations the Team used to determine the amount payable, as promptly as practicable following any applicable sale***.

*Id.* (Emphasis added).

18. On February 1, 2018, the County received a vague, conclusory, and unsubstantiated valuation that the 5% Equity Payment on the $1.2 Billion sale was $0 (the "False Valuation"). A copy of the False Valuation and its accompanying notes is attached hereto as **Exhibit C**.

19. Although the Equity Payment Clause expressly required that a detailed calculation be performed by "independent accountants," the accountants who prepared the calculations underlying the False Valuation expressly disclaimed any responsibility for ensuring that the calculation complies with the terms of the Equity Payment Clause. The False Valuation instead makes clear that the Loria Marlins directed the accountants to consider only the Loria Marlins'

specific assertions regarding compliance with the Equity Payment Clause. As the accountants'

disclaimer notes:

> We have examined management of [the Loria Marlins'] assertion that [the Loria Marlins] complied with the requirements listed in [the Equity Payment Clause]. [The Loria Marlins'] ***management is responsible for its assertion***. Our responsibility is to express an opinion on management's assertion about [the Loria Marlins'] compliance with the specified requirements based on our examination . . . . Our examination does not provide a legal determination on [the Loria Marlins'] compliance with the specified requirements.

False Valuation at 1 (emphasis added).

20.     The False Valuation also failed to include the "detailed calculation" that was

required to explain how the Marlins arrived at an Equity Payment amount of $0. For example, the

False Valuation baldly claims deductions from the fair market value of all proceeds received from

the sale of, among other things:

(a)     "Incremental debt" of approximately $279 Million;

(b)     $35 Million in "Contributions";

(c)     a "Financial advisor fee" paid to Tallwood Associates, Inc. of nearly $30 million, which purports to be a "transaction-related expense" based on an equity participation agreement apparently entered into in 2000 and clarified and restated in late 2010, ***after*** the Loria Marlins entered into the Non-Relocation Agreement with the County;

(d)     "Partners' income tax on sale" of almost $300 million; and

(e)     an increase in assumed value of the franchise of nearly $375 Million.

21.     The False Valuation also disregards the contractually agreed-upon formula for

calculating the increase in the assumed value over time, which was to be calculated as $20 Million

each year, for 9 years. Under the agreed-upon formula, the increase in assumed value should have

been **only *$180 Million***.  Yet the False Valuation inexplicably deducted an assumed value over time of ***$375 Million***.

22.     Although the False Valuation appears to have been directed, performed, and provided by the Loria Marlins and its accountants, the Equity Payment Clause imposed the valuation obligation on the successor Team owner (i.e., Marlins TeamCo).  *See* Equity Payment Clause ("The ***Team*** shall cause its independent accountants to provide … a detailed calculation….") (emphasis added).

23.     Moreover, as also described above, Marlins TeamCo has contractually assumed all of the Loria Marlins' contractual obligations under the Non-Relocation Agreement, including the obligation to make the Equity Payment.  *See generally* Assumption Agreement.

24.     Thus, both the Loria Marlins and Marlins TeamCo are responsible for the False Valuation.

25.     Following the execution of the Non-Relocation Agreement in 2009, the Loria Marlins' financial records for the years 2008 and 2009 were leaked to the public.  According to news reports, while the Loria Marlins claimed to the public that they were not profitable, they were in fact one of the most profitable teams in Major League Baseball in 2008.

26.     The leaked financial records also appeared to shed some light on how the unexplained **$279 Million** in "Incremental debt" might have been accrued. They revealed, among other things, that Loria's Double Play was loaning money to the Team, causing the Team to pay Loria's Double Play $3 Million in interest in 2008 and 2009 alone.  The leaked financials also revealed that, as of November 15, 2010, the Team was still on the hook to pay Loria's Double Play additional interest on an outstanding balance of $14.1 Million.

27.     In addition, the leaked financials revealed that the Loria Marlins paid Loria's Double Play an annual "Management" fee of $2.6 Million in 2008, $2.8 Million in 2009, and $3.2 Million in 2010.   The financials further revealed vague "Administration expenses" of $10 Million annually, which were in addition to $24 Million in annual expenses listed for "Operations and administration – baseball."

28.     Based on the leaked financials, the False Valuation that was provided to the County, and the failure to provide the County with a detailed <u>calculation performed by truly independent accountants,</u> the County is unable to verify, among other things, whether it was necessary for the Team to take on debt between the time that the Loria Marlins entered into the Non-Relocation Agreement until the time that it sold the Team.

29.     The County has demanded the required detailed calculation – including the supporting documentation – showing, among other things, how the Marlins arrived at their conclusions, and has further demanded documentation for all of the deductions that the Marlins have vaguely claimed under the Equity Payment Clause.   The Marlins have refused the County's demands.

30.     The False Valuation indicates that $50 Million in proceeds from the Loria Marlins' sale of the Team to Marlins TeamCo has been placed in an undisclosed escrow account to satisfy "potential obligations of the [Loria Marlins]" that may arise from the sale, and that ***those escrowed funds will be released back to the Loria Marlins in October 2018***.   Accordingly, time is of the essence.

## COUNT I

### (Violation of the False Claims Act Against the Defendants)

31.     The County incorporates its allegations in paragraphs 1 through 30.

32.     The County's False Claims Act, Section 21-258 of the Miami-Dade County Code of Ordinances,  makes it a civil violation for "any person [to] knowingly make[], use[], or cause[] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the County."

33.     As discussed above, the False Valuation: (1) fails to include the "detailed calculation" that was required to explain how the Equity Payment amount could be $0; (2) claims deductions "from the fair market value of all proceeds from the sale" that were not permitted under the Equity Payment Clause; and (3) reveals that it was not performed by "independent accountants," as required.

34.     The False Claims Act provides for monetary penalties, stating that "[a]ny person found to have submitted a false claim to the County shall: (a) Be liable to the County for an amount equal to three (3) times that part of the claim which is false, fraudulent, or inflated; (b) Immediately, fully, and irrevocably forfeit the entire amount of the claim; (c) Be liable to the County for all costs and fees (including, without limitation, reasonable legal, expert, and consulting fees) incurred by the County to review, defend, and evaluate the claim…."

35.     As a result of the Defendants' False Valuation submission, the County has been damaged, and the Defendants are obligated to pay the above-described penalties.

WHEREFORE, the County demands judgment against the Defendants:

(a) For treble damages, costs, interest, and attorneys' fees;

(b) Declaring that as a result of the False Valuation, the Defendants have immediately, fully, and irrevocably forfeited the entire amount of their deductions and reductions to the fair market value of the proceeds of the sale; and

(c) Any other relief that may be applicable.

OFFICE OF COUNTY ATTORNEY, MIAMI-DADE COUNTY, FLORIDA
TELEPHONE 305.375.5151

## COUNT II

**(Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") Claim
Against the Defendants)**

36.     The County incorporates its allegations in paragraphs 1 through 30.

37.     FDUTPA declares that: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." § 501.204(1), Fla. Stat.

38.     As discussed above, the Defendants caused to be delivered to the County the False Valuation, which constitutes a deceptive or unfair practice.

39.     Additionally, the False Valuation: (1) fails to include the "detailed calculation" that was required to explain how the Equity Payment amount could be $0; (2) claims deductions "from the fair market value of all proceeds from the sale" that were not permitted under the Equity Payment Clause; and (3) reveals that it was not performed by "independent accountants," which also constitute deceptive or unfair practices.

40.     As a result of the foregoing deceptive or unfair practices, the County has suffered actual damages.

WHEREFORE, the County demands judgment against the Defendants for damages, costs, interest, attorney fees (under § 501.2105, Fla. Stat.) and any other relief that may be applicable.

## COUNT III

**(Breach of Contract Against Marlins TeamCo)**

41.     The County incorporates its allegations in paragraphs 1 through 30.

42.     The Non-Relocation Agreement was a valid contract between the Loria Marlins and the County, and Marlins TeamCo assumed it under the Assumption Agreement.

43.     Marlins TeamCo has materially breached the Equity Payment Clause of the Non-Relocation Agreement by either failing to make, or cause to be made, the Equity Payment that it was contractually obligated to make.

44.     Marlins TeamCo has also materially breached the Equity Payment Clause by failing to provide, or cause to be provided, "as promptly as practicable following any applicable sale," a "detailed calculation" performed by "independent accountants," including "any other calculations. . . used to determine the amount payable."

45.     The provision of the False Valuation is evidence that the calculation has been performed and could have been provided.

46.     The Non-Relocation Agreement does not provide Marlins TeamCo with a right to cure any of the foregoing breaches of their Equity Payment Clause obligations, and there are no other conditions precedent to the County bringing this action.

47.     As a result of the breach, the County has suffered damages.

WHEREFORE, the County demands judgment against Marlins TeamCo for damages, costs, interest, and any other relief that may be applicable.

## COUNT IV

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Marlins TeamCo)

48.     The County incorporates its allegations in paragraphs 1 through 30.

49.     The Non-Relocation Agreement was a valid contract between the Loria Marlins and the County, and Marlins TeamCo assumed it under the Assumption Agreement.

OFFICE OF COUNTY ATTORNEY, MIAMI-DADE COUNTY, FLORIDA
TELEPHONE 305.375.5151

50.     Florida law implies a covenant of good faith and fair dealing in every contract, which requires that undefined or discretionary terms be interpreted in good faith to give effect to the overall intent of, and not frustrate the parties' expectations under, the agreement.

51.     Pursuant to the Equity Payment Clause, Marlins TeamCo had an obligation to make, or cause to be made, the Equity Payment to the County and City as a result of the recent sale of the Team.

52.     Among other things, in calculating the Equity Payment owed to the County and City, the Equity Payment Clause allowed Marlins TeamCo to deduct "from the fair market value of all proceeds from the sale ... (x) the assumed value of the franchise determined under the preceding sentence, (y) all transaction-related expenses and taxes payable by the Team Affiliates and/or their direct and indirect owners to unaffiliated third parties solely as a result of the sale, and (z) any liabilities or obligations retained by the Team (in the case of the sale of the franchise) and/or its direct or indirect owners relating to the Marlins or its affiliated businesses."

53.     The County's reasonable expectation in allowing the Loria Marlins (now Marlins TeamCo) to reduce the Equity Payment by the above-described deductions was that the Loria Marlins (now the Marlins TeamCo) would act in good faith and not, among other things, deduct unnecessary debt, incur unnecessary expenses, and engage in self-dealing by paying millions of dollars annually in management fees and interest to Loria's Double Play.

54.     The above-described actions constitute breaches of the implied covenant of good faith and fair dealing.

55.     As a result of these breaches, the County has been damaged.

WHEREFORE, the County demands judgment against Marlins TeamCo for damages, costs, and interest, and any other relief that may be applicable.

## COUNT V

### (Declaratory and Injunctive Relief Against the Defendants)

56.     The County incorporates its allegations in paragraphs 1 through 30.

57.     The Equity Payment Clause provides that, if the County does not serve a notice of objection within 30 days "after receiving the accountant's calculation, such calculation shall be final and binding…."

58.     The Defendants have taken the position that the False Valuation complies with their obligation to provide the County with detailed calculations, and that the 30-day period that the County has to provide its objections under the Equity Payment Clause has begun to run.

59.     The Defendants have refused to provide the detailed calculation needed to comply with their obligations under the Equity Payment Clause.

60.     The Equity Payment clause also provided for potential resolution by arbitration, ***provided that the following conditions precedent first occurred***: (1) that the Marlins TeamCo provided a "detailed calculation" by "independent accountants" as "promptly as practicable following any applicable sale"; (2) that the County or the City then served an objection "specify[ing] in reasonable detail the basis for its objections"; and (3) that the County or the City and Marlins TeamCo, sought to resolve but were unsuccessful at resolving the dispute within 60 days of the County or City's objection.  As the clause provides:

> The Team shall cause its independent accountants to provide the County and City a reasonably detailed calculation of the County/City Equity Payment (on a combined basis) under this Section 6, including a detailed calculation showing the assumed value, Net Proceeds and any other calculations the Team used to determine the amount payable, as promptly as practicable following any applicable sale.  If the County or City do not provide a notice of objection within thirty (30) days after receiving the accountant's calculation, such calculation shall be final and binding and payment of any amount due shall be made not later than thirty (30) days after the expiration of such period.  If the County or City does provide a notice of objection, it shall specify in reasonable detail the

OFFICE OF COUNTY ATTORNEY, MIAMI-DADE COUNTY, FLORIDA
TELEPHONE 305.375.5151

basis for its objections. The objecting Government Party and the Team shall then seek to resolve any disagreements between them within the succeeding period of sixty (60) days. If the objecting Government Party and the Team are unable to resolve the dispute within such sixty (60) day period, each of them shall have the right to commence arbitration in accordance with the Operating Agreement…."

Equity Payment Clause.

61.     As explained above, the County had a clear legal right to a "detailed calculation" by "independent accountants" "as promptly as practicable" following the sale, and the provision of the False Valuation constituted a material, incurable breach of the Equity Payment Clause.

62.     To the extent that the Defendants take the position that the 30-day period for the County to object has begun to run, and that they have a right to have calculation-related disputes arbitrated, the Defendants' failure to provide a "detailed calculation" by "independent accountants" as "promptly as practicable" following the sale constituted a failure to satisfy a condition precedent to their rights to receive a notice of objection and to arbitrate.

63.     Thus, the Equity Payment Clause's 30-day period and related arbitration provision are no longer in effect.

64.     If, however, the provision of the False Valuation on February 1, 2018, triggered the County's 30-day window for objecting under the Equity Payment Clause, and the objection period thus expires on March 2, 2018 – before the County receives the "detailed calculation" performed by "independent accountants" that it is entitled to, including the financial and other documents supporting the calculation – the County will be irreparably harmed.

65.     Thus, based on the foregoing dispute, there is a bona fide, actual, present, practical need for a declaration that the Defendants failed to comply with their material obligations under the Equity Payment Clause, and that the Equity Payment Clause's 30-day objection period and related arbitration provision are inoperable.

66.     The County's rights are dependent upon the interpretation of the Non-Relocation Agreement and its Equity Payment Clause.

67.     In addition, the County will also be irreparably harmed if the $50 Million currently being held in the escrow account is disbursed before the County is able to prosecute its claim for the Equity Payment.

68.     Upon information and belief, the funds being held in the escrow account are restricted funds, being held pursuant to the sale between the Loria Marlins and Marlins TeamCo to satisfy the Defendants' obligations, including the Equity Payment Obligation.

69.     The County, on the one hand, and the Marlins, on the other hand, have an actual, present, adverse, and antagonistic interest in the subject matter.

70.     The parties' antagonistic interests are before the Court by proper process.

71.     The relief sought by the County is not merely the giving of legal advice.

72.     The County has no adequate remedy at law.

WHEREFORE, the County demands judgment against the Defendants declaring:

i.   That they have failed to comply with their Equity Payment Clause obligation to promptly provide the County with the contractually-required detailed calculation performed by independent accountants.

ii.  That the 30-day period within which the County must serve an objection following its receipt of a "detailed calculation" performed by "independent accountants" has not yet begun to run, or is tolled pending resolution of this action.

iii. That the requirement to provide, as "promptly as practicable" following the sale, a "detailed calculation" performed by "independent accountants," was a condition precedent to the Defendants' ability to seek arbitration, and that the material breach of

OFFICE OF COUNTY ATTORNEY, MIAMI-DADE COUNTY, FLORIDA
TELEPHONE 305.375.5151

that requirement renders the arbitration provision in the Equity Payment Clause inoperable.

The County also demands a Permanent Injunction:

i. Requiring that the Defendants produce to the County the detailed calculation required under the Equity Payment Clause, including all financial records and other documents necessary to perform a proper calculation of the Equity Payment due to the County and City.

ii. Enjoining the operation of the Equity Payment Clause's 30-day objection and arbitration provisions.

iii. Prohibiting or enjoining the release or disbursement of funds in the escrow account during the pendency of this action.

OFFICE OF COUNTY ATTORNEY, MIAMI-DADE COUNTY, FLORIDA
TELEPHONE 305.375.5151

### Jury Trial Demand

The County demands a jury trial on all triable issues.

Date: February 16, 2018.

Respectfully submitted,

ABIGAIL PRICE-WILLIAMS
Miami-Dade County Attorney
Stephen P. Clark Government Center
111 Northwest 1st Street, Suite 2810
Miami, Florida 33128
Telephone: 305-375-5151
Facsimile: 305-375-5634

By:    /s/ Jorge Martinez-Esteve
       Jorge Martinez-Esteve
       Fla. Bar No.: 126391
       E-mail: jme@miamidade.gov
       Monica Rizo Perez
       Fla. Bar No.: 28319
       E-mail: rizo@miamidade.gov
       Ryan C. Zagare
       Fla. Bar No.: 28700
       E-mail: zagare@miamidade.gov
       *Attorneys for Miami-Dade County*

# EXHIBIT "A"

## NON-RELOCATION AGREEMENT

This Non-Relocation Agreement (this "<u>Agreement</u>") is made and entered into as of this /5ᵗʰ day of April, 2009, by and among Miami-Dade County, a political subdivision of the State of Florida (the "<u>County</u>"), the City of Miami, a municipal corporation of the State of Florida (the "<u>City</u>"), and Florida Marlins, L.P., a Delaware limited partnership (the "<u>Team</u>"). The County, City and the Team shall be referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>".

### Recitals

A.     The Team owns the Major League Baseball franchise known as the Florida Marlins.

B.     Contemporaneously with the execution of this Agreement, (i) the County, the City and Marlins Stadium Developer, LLC, an affiliate of the Team, are entering into a Construction Administration Agreement (the "<u>Construction Agreement</u>") providing for the planning, design and construction of the Baseball Stadium and the Public Infrastructure; and (ii) the County, the City and Marlins Stadium Operator, LLC, another affiliate of the Team (the "<u>Stadium Operator</u>"), are entering into an Operating Agreement (the "<u>Operating Agreement</u>") providing for the operation and management of the Baseball Stadium by the Stadium Operator. (Capitalized terms used but not defined in this Agreement have the meanings set forth in the Operating Agreement.)

C.     As a material inducement to the County and the City to enter into the Construction Agreement and the Operating Agreement, the Team has agreed to enter into this Agreement to assure that the Team will play its MLB home games at the Baseball Stadium on the terms and conditions set forth herein.

NOW, THEREFORE, the parties agree as follows:

1.     **<u>Discontinuation of Relocation Discussions</u>.**     Subject to Sections 2(d) and 3 below, the Team covenants and agrees that from the date of this Agreement and continuing through the earlier of (i) the Non-Relocation Term (as defined in Section 2 below) and (ii) the termination of this Agreement pursuant to Section 5.5, the Team and its agents shall discontinue all discussions, negotiations and efforts to relocate the Team's MLB franchise either temporarily or permanently to any location other than the Baseball Stadium for the period following the Substantial Completion of the Baseball Stadium.

2.     **<u>Covenant to Play at Baseball Stadium</u>.**     Subject to Section 3 below, the Team covenants and agrees that throughout the Non-Relocation Term:

(a)     the Team shall maintain its principal place of business in the City;

(b)     the Team shall maintain its MLB franchise in the City and use the Baseball Stadium as its home stadium; contraction of the Team by Major League Baseball shall

336

be deemed a violation of this clause; the Team shall not volunteer for contraction or vote in favor of its contraction;

(c)     the Team shall play all of its regular season and playoff (including World Series) MLB Home Games at the Baseball Stadium; and

(d)     the Team shall not enter into any contract or agreement, or make any request or application to Major League Baseball, to (i) relocate its franchise outside of the City in violation of clause (b) above or (ii) play any regular season or playoff MLB Home Game in any location other than the Baseball Stadium in violation of clause (c) above, provided that the Team may take the actions otherwise prohibited in this subsection (d) during the last three (3) years of the Term of the Operating Agreement in connection with any proposed relocation or playing of MLB Home Games that would not occur until the conclusion of the Term. The Team shall notify the County and City promptly after entering into any such contract or agreement, or making any such request or application. The covenants by the Team under this Section 2 are collectively referred to in this Agreement as the "Non-Relocation Covenants" and any violation of any of such covenants is referred to as a "Non-Relocation Default".

As used in this Agreement, "Non-Relocation Term" means the period commencing with the Substantial Completion Date and ending on the termination of this Agreement pursuant to Section 5.5 of this Agreement.

3.     **Exceptions**.  Notwithstanding Sections 1 and 2 above, the Team shall be permitted to play what would otherwise be an MLB Home Game at a location other than the Baseball Stadium:

(a)     in the case of an Alternate Site Condition as provided in Section 4;

(b)     in any consecutive five-year period, up to three (3) regular season MLB home games (not including any games played in different locations under Section 3(a) above) in an international or other location as permitted or requested by Major League Baseball;

(c)     in the case of playoff MLB games, at any location required by Major League Baseball; and

(d)     in the case of MLB games other than regular season and playoff games, at any location it chooses.

If the Substantial Completion Date occurs during an MLB season after one-half of the Team's regular season games have been played, the covenants in Section 1 shall not apply with respect to that MLB season, and the covenants in Section 2 shall not become effective until the start of the succeeding MLB season.

The Team may take any actions otherwise prohibited by Section 1 or 2 in connection with any change in location permitted by this Section 3.

Without limiting the generality of any other provision of this Agreement, the covenants of the Team provided in Sections 1 and 2 shall not apply if (i) the County and the City

2

Representatives jointly consent in a writing signed by both parties to any action(s) otherwise prohibited under such section; except that any actions which would allow the Team to permanently relocate from the City shall require the approval of the City Commission and the Board of County Commissioners, or (ii) at any time after the termination of this Agreement.

4. **Alternate Site Condition.**

(a)     Notwithstanding the provisions of Section 1 or Section 2, if, at any time during the Non-Relocation Term, an Alternate Site Condition shall exist, then (i) the Team shall be entitled to make arrangements to temporarily play at alternate sites for the Team's MLB Home Games and (ii) the Team shall be relieved of its obligations under Sections 1 and 2 and shall be entitled to play its MLB Home Games at such alternate sites, but only during the period of time that any such Alternate Site Condition shall exist; provided, however, that if the Alternate Site Condition shall be of such a nature that its expected expiration cannot reasonably be ascertained by the Team, then the Team shall be entitled to honor any commitment it might reasonably have made to play MLB Home Games at an alternate site even if that commitment extends beyond the date such Alternate Site Condition ends. However, if the County or the City obtain or possess reasonable evidence that the expiration of the Alternate Site Condition can be ascertained, either Party may seek to have such matter determined by Arbitration pursuant to Article 18 of the Operating Agreement. The Team shall not, however, make any commitment that extends beyond the end of the MLB Season in or prior to which such Alternate Site Condition occurs, except that, if, as of December 1 of any Operating Year, such Alternate Site Condition is reasonably expected (as determined in accordance with Section 4(b)) to continue for more than sixty (60) days of any subsequent MLB season, then the Team shall be entitled to commit to play its home games at an alternate site for the duration of such MLB season.

(b)     Not later than November 1 of any Operating Year in which an Alternate Site Condition continues to exist, the Team shall give the County and City Representatives a written notice setting forth the date it reasonably believes such Alternate Site Condition will terminate (the "Proposed Date"). If the City or County Representative fails to object to such notice within five (5) Business Days, it will be deemed to have accepted the Proposed Date and the Team's right to contract with alternate sites under Section 4(a) shall be based on such date. If the County or City Representative timely objects to the Proposed Date, the Parties shall use good faith efforts to resolve such dispute within the next five (5) Business Days. If the dispute cannot be resolved, either Party may seek to have such date determined by Arbitration pursuant to Article 18 of the Operating Agreement and such panel shall be directed to seek to hear and resolve the dispute by the immediately succeeding December 1. Any determination by the Arbitrator Panel shall be final, binding and non-appealable by the Parties for purposes of determining the Team's right to contract with alternate sites under Section 4(a). The County, the City and the Team shall consult, and reasonably cooperate, with one another following any Alternate Site Condition so that the Team can most effectively find and contract for an alternate site during the duration of such Alternate Site Condition.

(c)     The Team shall use commercially reasonable and diligent efforts to mitigate and overcome any Alternate Site Condition that results in its regular season or playoff MLB Home Games not being played at the Baseball Stadium to the extent such event or condition is within the reasonable control of the Team, but this undertaking shall not be

construed to require the Team to take any action, or to relieve the County or the City of any obligation it may have, with respect to a Condemnation Action, Casualty or Force Majeure that is the County's or City's responsibility under the Operating Agreement or require the Team to take any action with respect to strikes, labor unrest or disputes, or take any action that the Operator is not required to take under the Operating Agreement.

(d)     As used in this Agreement, "Alternate Site Condition" shall mean the existence of any one of the following:

(i)     Major League Baseball determines the condition of the Stadium Premises is or may be (e.g., due to an impending or recently occurring storm) such that MLB Rules and Regulations, or a specific Major League Baseball directive, prohibits the playing of MLB Home Games at the Baseball Stadium in a written direction, declaration or ruling addressed to the County, the City and the Team; or

(ii)     a Governmental Authority determines the use or occupancy of any material portion of the Stadium Premises (excluding the Plaza) is (a) not permitted under any Applicable Law or (b) is unsafe for customary usage.

5.     **Remedies**.

**5.1     Non-Relocation Default**.     Upon the occurrence of a Non-Relocation Default, each of the County and the City shall have the option to pursue any one or more of the remedies set forth in Section 5.2, Section 5.3 or Section 5.4, that may be applicable. Upon the occurrence of any other breach or misrepresentation in this Agreement by the Team, each of the County and the City shall have the option to pursue any one or more of the remedies set forth in Section 5.4.

**5.2     Declaratory or Injunctive Relief**.     Upon the occurrence of a Non-Relocation Default, each of the County and the City shall be entitled to seek injunctive relief prohibiting or mandating action by the Team in accordance with, or declaratory relief with respect to, the Non-Relocation Covenants. In addition, the Team: (a) acknowledges that the Non-Relocation Covenants are an essential part of the bargain and consideration of the Stadium Agreements and are necessary to protect the business and goodwill of the County and the City; (b) recognizes that the Baseball Stadium is being constructed and certain debt is being incurred by the County and the City to permit the MLB Home Games in the Baseball Stadium during the Non-Relocation Term; (c) recognizes that having the Team play its MLB Home Games in the Baseball Stadium throughout the Non-Relocation Term provides a unique value to each of the County and the City, including generating new jobs, additional revenue sources and economic development and increased tourism for the County and the City; and (d) acknowledges and agrees that any breach by the Team of the Non-Relocation Covenants shall cause irreparable and continual harm to the County and the City and that damages for a default under such Non-Relocation Covenants cannot be estimated with any degree of certainty and that monetary damages cannot fairly or adequately compensate the County and the City for a breach of such Non-Relocation Covenants. Accordingly, the Team agrees that, in the event of any of the actual or threatened breach by the Team of any one of the Non-Relocation Covenants (i) each of the County and the City shall be entitled to seek and obtain, a temporary restraining order, together

with temporary, preliminary and permanent injunctive or other equitable relief, from any court of competent jurisdiction, to restrain or enjoin any actual or threatened breach by the Team of any Non-Relocation Covenant without the necessity of posting a bond or other security and without any further showing of irreparable harm, balance of harms, consideration of the public interest or the inadequacy of monetary damages as a remedy, (ii) the administration of an order for injunctive relief would not be impractical and, in the event of any breach of any Non-Relocation Covenant by the Team, the balance of hardships would weigh in favor of entry of injunctive relief, and (iii) each of the County and the City may enforce any Non-Relocation Covenant contained in this Agreement through specific performance. The Parties hereby agree and irrevocably stipulate that (x) the rights of each of the County and the City to injunctive relief pursuant to this Non-Relocation Agreement shall not constitute a "claim" pursuant to section 101(5) of the United States Bankruptcy Code (the "Bankruptcy Code") and shall not be subject to discharge or restraint of any nature in any bankruptcy proceeding involving the Team, (y) this Agreement is not an "executory contract" as contemplated by section 365 of the Bankruptcy Code, and (z) action(s) taken by each of the County and the City pursuant to this Section 5.2 shall not in any way prejudice any other rights or remedies that the County and the City may have under Section 5.3 or Section 5.4 of this Agreement or under the other Stadium Agreements if a court of competent jurisdiction fails to provide injunctive or other equitable relief prohibiting the Team's violation of the Non-Relocation Covenants or, in the case of the remedies set forth in Section 5.4, fails to award liquidated damages under Section 5.3.

      **5.3**    **Liquidated Damages**. The Parties acknowledge and agree that if the County or the City do not obtain injunctive or other equitable relief pursuant to Section 5.2, the County and the City each shall be entitled to seek and obtain relief pursuant to this Section 5.3 in the event a court of competent jurisdiction determines, in a final and non-appealable order, that the Team has breached its covenants under Section 2(c) (a "Final Order"). The Parties also recognize, agree, and stipulate that the financial, civic, and social benefits to the County and the City from the presence of the Team and the playing of its MLB Home Games in Miami, Florida are great, but that the precise value of those benefits cannot be estimated with any degree of certainty due to the number of citizens and businesses that rely upon and benefit from the presence of the Team in Miami, Florida. Accordingly, the magnitude of the damages that would result from a breach of Section 2(c) hereof that is not enjoined by a court of competent jurisdiction notwithstanding the intent of the parties, would be very significant in size but are not readily ascertainable and would include damages to the reputation and finances of the County and the City. Therefore, the Parties agree that in the event of a violation of Section 2(c) hereof, including, without limitation, any such breach arising pursuant to the provisions of section 365(g) of the United States Bankruptcy Code or similar provision of any successor thereto, the County and the City will be entitled to recover from the Team the amounts set forth in Subsection 5.3.1:

      **5.3.1**    **Liquidated Damages**. If the County or the City do not obtain injunctive or other equitable relief pursuant to Section 5.2 and the violation of Section 2(c) is not cured prior to the date that a court of competent jurisdiction enters a Final Order, the County shall be entitled to receive, as reasonable estimated liquidated damages and not as a penalty, the County Liquidated Damages (as hereafter defined) and the City shall be entitled to receive, as reasonable estimated liquidated damages and not as a penalty, the City Liquidated Damages (as hereafter defined). For purposes of this Agreement, "County Liquidated Damages" shall mean

5

*346*

the sum of (a) the then outstanding balance of principal and interest of the County Bonds (as such term is defined in the Construction Administration Agreement), (b) the unamortized amount of Public Infrastructure Costs and any other costs for the Baseball Stadium Project paid by the County under the Construction Administration Agreement (which amount shall be amortized on a straight line basis over 30 years) without duplicating amounts in (a) if such Public Infrastructure Costs or other costs are funded from County Bonds, and (c) the present value of all Capital Reserve Fund contributions required to be made by the Stadium Operator pursuant to Section 9.3(b) of the Operating Agreement. For purposes of this Agreement, "City Liquidated Damages" shall mean the sum of (i) the then outstanding balance of principal and interest of the City Bonds (as such term is defined in the Construction Administration Agreement), (ii) the unamortized balance of the funds (other than the proceeds of the City Bonds) deposited in the City Account (as such term is defined in the Construction Administration Agreement) in an amount that, together with proceeds of the City Bonds, will be equal to $13,000,000 (which balance shall be amortized on a straight line basis over 30 years), (iii) the present value of all regular season MLB Home Game parking fees owed to the City under Section 6.3(a) of the City Parking Agreement (assuming 81 regular season MLB Home Games) prior to the end of the Term (as such term is defined in the City Parking Agreement), and (iv) the unamortized amount of Public Infrastructure Costs and any other costs for the Baseball Stadium Project paid by the City under the Construction Administration Agreement (which amount shall be amortized on a straight line basis over 30 years), without duplicating amounts in (i) and (ii) if such Public Infrastructure Costs or other costs are funded from City Bonds or amounts referred to in (ii).

   **5.3.2**  **Present Value**. All calculations of the present value of any unpaid amounts to be made by the Team under this Section 5.3 shall use a discount rate of seven percent (7%) per annum.

   **5.3.3**  [Intentionally Omitted]

   **5.3.4**  **Acknowledgement**. The Parties hereby acknowledge that they have negotiated the amounts set forth in this Section 5.3 in an attempt to make a good faith effort in quantifying the amount of damages due to a violation of Section 2(c) hereof despite the difficulty in making such determination.

   **5.4**  **Actual Damages**. In the event of any breach of or misrepresentation in this Agreement by the Team (other than a Non-Relocation Default subject to the remedies set forth in Section 5.2 or, if applicable, Section 5.3), or in the event of a Non-Relocation Default for which, notwithstanding the intent of the Parties, the County and the City are unable to obtain the relief set forth in Section 5.2 or, if applicable, Section 5.3, the County and the City shall have the right (i) to institute any and all proceedings or claims permitted by law or equity to recover any and all amounts necessary to compensate the County and the City for all damages proximately caused by the Team's breach under this Agreement, and (ii) to institute any and all proceedings or claims permitted by law or equity to compel specific performance with respect to the Team's obligations under this Agreement and one or more actions to seek and obtain a temporary restraining order, together with such other temporary, preliminary and permanent injunctive or other equitable relief, from any court of competent jurisdiction capable of issuing or granting such relief, to compel the Team to comply with or refrain or cease from breaching or violating the terms, covenants and conditions of this Agreement.

### 5.5 Termination.

(a)     Upon the entry of a Final Order with respect to a default by the Team under Section 2(c), the County and the City shall have the right, but not the obligation, to give to the Team joint written notice (a "Final Notice") of their intention to terminate this Agreement and all other Stadium Agreements. After the expiration of a period of thirty (30) days from the date such Final Notice is given, unless the default is cured, this Agreement and the other Stadium Agreements may, at the sole option of the County and the City, be terminated without liability to the County and the City by further written notice to the Team. If, however, within such thirty (30) day period, the Team's default under Section 2(c) is cured, then this Agreement and the other Stadium Agreements shall not terminate by reason of such Final Notice.

(b)     This Agreement, and all obligations of the Parties under this Agreement, shall terminate without further action by, or liability to, any Party upon the expiration or termination of the Operating Agreement for any reason expressly permitted under the Operating Agreement; provided that upon a termination of the Operating Agreement jointly by the County and the City upon the entry of a Final Order that the Team has breached Section 2(c) of this Agreement, this Agreement shall only terminate as provided in Section 5.5(a) above. For the avoidance of doubt, until the end of the Non-Relocation Term, the Team shall remain bound by, and shall not be relieved of, its obligations under this Agreement upon a termination by the County and the City of the Operating Agreement due to a breach of Section 2(c) of this Agreement by the Team as described in the preceding sentence. Except for the provisions of this Agreement that are expressly to survive termination, and except as provided in this Section 5.5(b), in the event of a termination of this Agreement and the other Stadium Agreements under this Section 5.5, then all obligations of the Parties under this Agreement and such other Stadium Agreements automatically also shall terminate.

(c)     Termination of this Agreement and the other Stadium Agreements shall not alter any existing claim of any Party for breaches of this Agreement or the other Stadium Agreements occurring prior to such termination and the obligations of the Parties thereto with respect to such existing claims shall survive termination, including, without limitation, the obligations under Sections 5.1, 5.2, 5.3 and 5.4 hereof.

### 5.6 Cumulative Remedies.
Except as expressly set forth in Section 5.2, Section 5.3 and Section 5.4, each right or remedy of the County and the City provided for herein shall be cumulative of and shall be in addition to every other right or remedy of the County and the City provided for in this Agreement, and the exercise (or the beginning of the exercise) by the County and the City of any one or more of the rights or remedies provided for in this Agreement, shall not preclude the simultaneous or later exercise by the County and the City of any or all other rights or remedies provided for in this Agreement or any other Stadium Agreement or hereafter existing at law or in equity, by statute or otherwise.

### 6. Payment Upon Sale of Team.
Upon a sale to a third party of a "control interest" (defined as the sale of more than 50% of the voting, actual or beneficial interest in the Marlins franchise, occurring within the period commencing with the approval of the Stadium Agreements by the City Commission and the Board of County Commissioners and ending ten (10) years

thereafter (not to exceed 72 months following Substantial Completion), whether through a sale of equity shares or partnership interests, a sale of substantially all of the Team's assets or a merger, consolidation, joint venture or similar change of control transaction, to the extent proceeds are paid to the holders of equity securities of the Team and not contributed in the ordinary course of business to Team Affiliates involved in baseball related businesses) (other than following the death of the controlling owner), the Team shall or shall cause the seller to pay to the County and the City, to be split on a pro-rata basis (including the value of the City's contribution of the Baseball Stadium Site, the amount of the City's and the County's expenditures as required by the Construction Agreement, and the value of the City and the County's respective expenditures associated with the Public Infrastructure) determined by each respective parties' contribution to the Baseball Stadium, an amount equal to the following percentage of the Net Proceeds of the sale that are attributable to any increase in value of the franchise (pro-rated in the case of a sale of the control interest) (the "County/City Equity Payment"):

| Phase of Project | Year | Description of Time-Frame | Percentage |
|---|---|---|---|
| Construction Phase | Year 1 | If sale occurs within 12 months of approval date of Stadium Agreements | 70% |
| Construction Phase | Year 2 | Sale occurs within 24 months of approval date of Stadium Agreements | 60% |
| Construction Phase | Year 3 | Sale occurs within 36 months of approval date of Stadium Agreements | 50% |
| Construction Phase | Year 4 | Sale occurs within 48 months of approval date of Stadium Agreements, or, prior to Substantial Completion of Stadium, whichever occurs first | 30% |
| Operational Phase | Year 1 | Sale occurs within 12 months of Substantial Completion | 10.0% |
| Operational Phase | Year 2 | Sale occurs within 24 months of Substantial Completion | 7.5% |
| Operational Phase | Year 3 | Sale occurs within 36 months of Substantial Completion | 5.0% |
| Operational Phase | Year 4 | Sale occurs within 48 months of Substantial Completion | 5.0% |
| Operational Phase | Year 5 | Sale occurs within 60 months of Substantial Completion | 5.0% |
| Operational Phase | Year 6 | Sale occurs within 72 months of Substantial Completion | 5.0% |

The increase in value shall be based on an assumed value of the franchise of $250,000,000 as of the date of the BSA, which assumed value shall be increased to give effect to any additional debt incurred by, or equity capital contributions made to the Team, Stadium Developer or Operator,

including the capital contributions made to, or the debt incurred by, the Stadium Developer or the Team pursuant to the Construction Administration Agreement (net of distributions to any such Team owners) and an imputed increase in value of 8% per annum from the date of the BSA. "Net Proceeds" shall mean the fair market value of all proceeds received from the sale plus any indebtedness for borrowed money of the Team or any Team Affiliate assumed by the buyer in the sale, less (x) the assumed value of the franchise determined under the preceding sentence, (y) all transaction-related expenses and taxes payable by the Team Affiliates and/or their direct and indirect owners to unaffiliated third parties solely as a result of the sale, and (z) any liabilities or obligations retained by the Team (in the case of a sale of the franchise) and/or its direct or indirect owners relating to the Marlins or its affiliated businesses.

The Team shall cause its independent accountants to provide the County and City a reasonably detailed calculation of the County/City Equity Payment (on a combined basis) under this Section 6, including a detailed calculation showing the assumed value, Net Proceeds and any other calculations the Team used to determine the amount payable, as promptly as practicable following any applicable sale. If the County or City do not provide a notice of objection within thirty (30) days after receiving the accountant's calculation, such calculation shall be final and binding and payment of any amount due shall be made not later than thirty (30) days after the expiration of such period. If the County or City does provide a notice of objection, it shall specify in reasonable detail the basis for its objections. The objecting Government Party and the Team shall then seek to resolve any disagreements between them within the succeeding period of sixty (60) days. If the objecting Government Party and the Team are unable to resolve the dispute within such sixty (60) day period, each of them shall have the right to commence arbitration in accordance with the Operating Agreement. If the arbitrator shall enter a final, non-appealable order requiring payment from the Team under this Section 6, the Team shall pay such amount within thirty (30) days thereafter.

7. **Annual Payment**. In consideration for its use of the Baseball Stadium, the Team shall remit to the County an annual amount of $2,300,000 per year, growing at two percent (2%) per year, for each Operating Year during the Initial Term of the Operating Agreement, in semi-annual installments of $1,150,000 (growing at 2% annually) on April 30 and September 30 of each Operating Year; provided, however, that if Substantial Completion occurs after April 30 but before September 30 in the first Operating Year, then the Team shall remit to the County $1,150,000 within thirty (30) days following Substantial Completion and $1,150,000 on or before September 30, and if Substantial Completion occurs after September 30, the Team shall remit to the County $2,300,000 within thirty (30) days of Substantial Completion but in no event later than October 31 for the first Operating Year. Such annual amount shall be negotiated by the Team and the County prior to the commencement of any Renewal Term. Notwithstanding any other provisions of this Agreement or of the Operating Agreement relating to termination, this Section 7 shall survive any early termination of this Agreement and the Operating Agreement arising from the Operator's termination of the Operating Agreement pursuant to Section 17.5.3 of the Operating Agreement.

8. **Indemnification by the Team**. The Team shall indemnify and hold harmless the City and the County and each and all of its directors, officers, employees, agents, licensees, independent contractors and consultants or any of them as their interests may appear (collectively, "Government Indemnitees"), of, from and against all claims, fines, claim costs,

charges and expenses, liabilities, suits, obligations, demands, actions, settlements, and judgments recovered from any of them, including attorneys' fees incurred to defend such claims (collectively, "Losses"), to the extent such Losses arise from any breach of this Agreement by the Team. Any such indemnification shall be provided in accordance with the indemnification procedures set forth in Section 13.3 of the Operating Agreement. The Team expressly understands and agrees that any insurance protection required by this Agreement or otherwise provided by the Team shall in no way limit the responsibility to indemnify, keep and save harmless and defend the Government Indemnitees as herein provided.

9. **Change of Name** The Team shall change its name to the "Miami Marlins" prior to the Substantial Completion Date and shall continue to use that name for the Term of the Operating Agreement, including any Renewal Term.

10. **Governing Law; Interpretation**. This Agreement has been negotiated, executed and delivered in Florida, and shall be governed by the laws of the State of Florida without reference to the conflicts of law principles of that State. Venue for any judicial, administrative or other action to enforce or construe any term of this Agreement or arising from or relating to this Agreement shall be exclusively in Miami, Florida. The headings of sections and paragraphs in this Agreement are for convenience only and shall not be construed in any way to limit or define the content, scope or intent of the provisions hereof. As used in this Agreement, the singular shall include the plural, and masculine, feminine and neuter pronouns shall be fully interchangeable where the context so requires. If any provision of this Agreement, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein. Time is of the essence of this Agreement. Any and all claims, demand or other actions related to this Agreement shall be subject to the exclusive jurisdiction of United States District Court of the Southern District of Florida. The Parties irrevocably submit to such jurisdiction.

11. **Entire Agreement**. This Agreement and the other Stadium Agreements contain the sole and entire agreement among the Parties and their Affiliates with respect to their subject matter, are fully integrated, and supersede all prior written or oral agreements among them relating to that subject matter, including the BSA. This Agreement may not be modified, amended or waived except by a written instrument signed by each of the parties affected thereby, and approved by the Board and the City Commission, if applicable. Waiver by any Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or other provision of this Agreement. This Agreement shall terminate upon the conclusion of the Term of the Operating Agreement.

12. **Representations and Warranties**. The Team hereby represents and warrants to the County and the City as follows:

(a) the execution, delivery and performance by the Team of this Agreement have been duly authorized by all necessary limited partnership action, and do not and will not contravene or conflict with (i) the limited partnership agreement of the Team, (ii) any provision of Baseball Rules and Regulations, (iii) any law, order, rule, regulation, writ, injunction or decree now in effect of any government, governmental instrumentality or court having jurisdiction over

the Team, or (iv) any loan agreement or other contractual restriction binding on or affecting the Team or any of its property or assets, except where any of the foregoing could not reasonably be expected to have a material adverse effect on the Team;

(b) this Agreement is a legal, valid and binding obligation of the Team enforceable against the Team in accordance with its terms;

(c) except as disclosed in writing to the County or the City, there is no action, proceeding or investigation pending or, to the knowledge of the Team, threatened or affecting the Team, which may adversely affect the ability of the Team to fulfill and perform its obligations and its other undertakings under this Agreement. The Team is not in default with respect to any judgment, order, injunction or decree of any Governmental Authority which is in any respect material to the transactions contemplated in and by this Agreement;

(d) the Team is a limited partnership duly formed, validly existing, and in good standing under the laws of the State of Delaware;

(e) the Team is a member in good standing of Major League Baseball and is in compliance in all material respects with all applicable Baseball Rules and Regulations which are relevant to the transactions contemplated herein; and

(f) the Team has full power and legal right to execute and deliver this Agreement and to perform and observe the provisions of this Agreement.

13. **Team Acknowledgment.** The Team hereby acknowledges that pursuant to Section 15.3(i) of the Operating Agreement, in the event there are any unpaid obligations under the Operating Agreement for which the Operator shall not have adequate reserves or reasonably anticipated revenues arising from Revenue Rights, and which are not being contested by the Operator in good faith, the Operator has covenanted and shall not make any further payments to the Team under its license agreement with the Team or any distributions of stadium revenues to the Team Affiliates and/or its partners until all such obligations have been fully satisfied.

14. **Successors and Assigns; Third Party Beneficiaries.**

(a) This Agreement shall bind the Team and its assigns and successors; provided that the Team shall not be entitled to transfer or assign its obligations hereunder without the prior written consent of the Government Parties, which consent shall be in their sole discretion; provided, further, however, that the Team may, without the prior written consent of the Government Parties, transfer and assign its obligations hereunder to any Person (or Affiliate of any Person) that acquires the Team's MLB franchise with the required approval of Major League Baseball, provided that (i) such transferee assumes unconditionally, in a writing reasonably satisfactory to the Government Parties, all of the obligations of the Team under this Agreement, and (ii) such transferee or its Affiliates assume all of the other obligations of the Stadium Operator and its Affiliates under the Stadium Agreements.

(b) This Agreement shall bind the Government Parties and their respective assigns and successors; provided that neither of the Government Parties may transfer or assign

this Agreement or any of their respective rights and obligations hereunder without the prior written consent of the Team, which consent shall be in the Team's sole discretion.

(c)     Nothing in this Agreement, express or implied, is intended to (a) confer upon any Person other than the parties and their permitted successors and assigns any rights or remedies under or by reason of this Agreement as a third-party beneficiary or otherwise; or (b) authorize anyone not a party to this Agreement to maintain an action pursuant to or based upon this Agreement.

15.     **Nonrecourse Liability of Team Personnel.**  Notwithstanding and prevailing over any contrary provision or implication in this Agreement and except for their criminal acts with respect to this Agreement (i.e., acts which would constitute crimes were they prosecuted for and convicted of such acts), the officers, directors, partners, shareholders, members, employees and agents of the Team and their Affiliates (the "Team Personnel") shall not in any way be liable under or with respect to this Agreement; no deficiency or other monetary or personal judgment of any kind shall be sought or entered against any of the Team Personnel with respect to liability under or with respect to this Agreement; no judgment with respect to liability under or with respect to this Agreement shall give rise to any right of execution or levy against the assets of any of the Team Personnel; and the liability of the Team under this Agreement shall be limited to the assets of the Team.

16.     **Notices.**  Any notice, consent or other communication under this Agreement shall be in writing and shall be considered given when delivered in person or sent by facsimile or electronic mail (provided that any notice sent by facsimile or electronic mail shall simultaneously be sent personal delivery, overnight courier or certified mail as provided herein), one Business Day after being sent by reputable overnight carrier, or three Business Days after being mailed by certified mail, return receipt requested, to the parties at the addresses set forth below (or at such other address as a party may specify by notice given pursuant to this Section to the other parties):

To the County:          County Manager
                        111 NW 1st Street, Suite 2900
                        Miami, Florida 33128
                        Attention: George M. Burgess

with a copy to:         County Attorney
                        111 NW 1st Street, Suite 2810
                        Miami, Florida 33128
                        Attention: Robert A. Cuevas, Jr. and Geri Keenan

To the City:            City Manager
                        444 SW 2nd Avenue, 10th Floor
                        Miami, Florida 33130
                        Attention: Pedro G. Hernandez

with a copy to:                   City Attorney
                                  444 SW 2nd Avenue, 10th Floor
                                  Miami, Florida 33130
                                  Attention: Julie O. Bru and Olga Ramirez-Seijas

To the Team:                      2267 Dan Marino Boulevard
                                  Miami, Florida 33056
                                  Attention: David Samson and Derek Jackson

with a copy to:                   Proskauer Rose LLP
                                  1585 Broadway
                                  New York, New York 10036
                                  Attention: Wayne D. Katz, Esq.

17.    **Subordination**. The Team acknowledges and agrees that its right to receive any payments from the Stadium Operator (including equity distributions) shall be subordinate to the Stadium Operator's payment obligations under the Operating Agreement.

18.    **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under Applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under Applicable Law, the Parties shall, to the extent possible, negotiate a revised provision which (a) complies with Applicable Law, (b) does not alter any of the substantive rights, obligations or liabilities of any party under this Agreement or any other Stadium Agreement, and (c) confers upon the Parties the benefits intended to be conferred by the invalid provision; and the remaining provisions of this Agreement, if capable of substantial performance, shall be enforced as if this Agreement was entered into without the invalid provision.

19.    **County Inspector General and Commission Auditor**. The attention of the Operator is hereby directed to Section 2-1076 of the County Code establishing the Miami-Dade County Office of the Inspector General (the "OIG"), which has the authority and power to investigate County affairs and review past, present and proposed County programs, accounts, records, contracts and transactions. The OIG contract fee shall not apply to this Agreement or any other Stadium Agreement, and the Team Affiliates shall not be responsible for any expense reimbursements or other amounts payable to the OIG or its contractors. The attention of the Operator is hereby directed to Section 2-481 of the County Code related to the Commission Auditor.

20.    **Sovereign Rights**. The County and City retain all of their respective sovereign prerogatives and rights as a county or city under State law with respect to the planning, design, construction, development and operation of the Baseball Stadium. It is expressly understood that notwithstanding any provisions of this Agreement and the Stadium Agreements and the County's and the City's status thereunder:

(a)    The County and the City retain all of their sovereign prerogatives and rights and regulatory authority (quasi-judicial or otherwise) as a county or city under State law and shall in no way be estopped from withholding or refusing to issue any approvals of applications for building, zoning, planning or development under present or future laws and regulations whatever nature applicable to the planning, design, construction and development of the Baseball Stadium, the Baseball Stadium Site, the Public Infrastructure, the Other Development or the Parking Facilities, or the operation thereof, or be liable for the same; and

(b)    The County and the City shall not by virtue of this Agreement or the other Stadium Agreements be obligated to grant the other, or the Team, any Team Affiliate, or the Stadium Developer any approvals of applications for building, zoning, planning or development under present or future laws and ordinances of whatever nature applicable to the planning, design, construction, development and/or operation of the Baseball Stadium, the Baseball Stadium Site, the Public Infrastructure, the Other Development or the Parking Facilities.

Notwithstanding and prevailing over any contrary provision in this Agreement, any County or City covenant or obligation that may be contained in this Agreement shall not bind the Board, the County's Planning and Zoning Department, DERM, the Commission or any other County, City, federal or state department or authority, committee or agency to grant or leave in effect any zoning changes, variances, permits, waivers, contract amendments, or any other approvals that may be granted, withheld or revoked in the discretion of the County or City or other applicable governmental agencies in the exercise of its police power.

21.    **Force Majeure.**  If any Party shall be delayed in the performance of any obligation hereunder as a result of a Force Majeure, then the performance of such obligation shall be extended by the length of such delay. In response to and during any delay caused by a Force Majeure, the Parties shall at all times act diligently and in good faith to bring about the termination or removal of the Force Majeure as promptly as reasonably possible and any party seeking an excuse of performance due to such Force Majeure shall work diligently and in good faith to reduce or eliminate any damage, cost or delay caused by such Force Majeure. Without limiting the foregoing, if a Party fails to meet a deadline specified in this Agreement due to another Party's failure to meet a prior and related deadline (or due to an event covered by Section 3.6(f) of the Construction Agreement), such subsequent deadline shall be extended by the number of days the delay was attributable to the prior deadline failure, and the Party failing to meet the prior deadline shall not be relieved of liability for such breach.

22.    **Counterparts.**  If this Agreement is executed in several counterparts, each of those counterparts shall be deemed an original, and all of them together shall constitute one and the same instrument.

23.    **Rescission of Delegations.**  Notwithstanding and prevailing over anything to the contrary in this Agreement, the parties agree that the Board may at any time rescind any or all delegations of authority to the County Representative set forth in this Agreement. In such instances, the approval, consent or action sought shall be subject to approval by the Board and, if a time frame for the County Representative's approval, consent or action is set forth in this Agreement, the Board shall consider the matter no later than the 2nd regularly scheduled meeting

of the Board after committee consideration. All such time frames for County Representative approvals set forth in this Agreement shall be deemed amended accordingly.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement as of the date and year first above written.

CITY OF MIAMI, FLORIDA

By: _____
    Pedro G. Hernandez
    City Manager
    City of Miami

MIAMI-DADE COUNTY, FLORIDA

By: _____
    George M. Burgess
    County Manager
    Miami-Dade County

ATTEST:

By: _____ 4-10-09
    for City Clerk

ATTEST:

By: _____
    Clerk of the Board

APPROVED AS TO FORM AND
CORRECTNESS:

_____
    City Attorney JAY
    JULIE O. BRU

APPROVED AS TO INSURANCE
REQUIREMENTS:

_____
LeeAnn Brehm
Risk Management Director

APPROVED AS TO FORM AND
LEGAL SUFFICIENCY:

JRA for GBK
_____
    County Attorney

FLORIDA MARLINS, L.P.

By:  Double Play Company,
    its General Partner

By: _____
    Name: DAVID P. SAMSON
    Title: President

16

350A

# EXHIBIT "B"

## STADIUM AGREEMENT ASSIGNMENT AND ASSUMPTION AGREEMENT

This Stadium Agreement Assignment and Assumption Agreement is entered into as of October 2, 2017, by and between Miami Marlins, L.P., a Delaware limited partnership ("Assignor"), and Marlins Teamco LLC, a Delaware limited liability company ("Assignee").

A.      Assignor is party to (i) the Non-Relocation Agreement, dated as of April 15, 2009, among Assignor, Miami-Dade County and the City of Miami (the "Non-Relocation Agreement") and (ii) the Assurance Agreement, dated as of April 15, 2009, among Assignor, Miami-Dade County and the City of Miami (the "Assurance Agreement").

B.      On the date hereof, Assignee has acquired the Major League Baseball franchise known as the "Miami Marlins" from Assignor with the required approval of Major League Baseball.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      ***Assignment and Assumption***.    Assignor hereby assigns to Assignee, and Assignee hereby assumes unconditionally from Assignor and agrees to pay, perform and discharge when due, all of the obligations and liabilities of Assignor under the Non-Relocation Agreement and the Assurance Agreement.

2.      ***Other Stadium Agreements***.    The parties acknowledge and agree that, on the date hereof, Assignee has acquired all of the ownership interests in Marlins Stadium Operator, LLC ("MSO") and Marlins Stadium Developer, LLC ("MSD") and, therefore, MSO and MSD shall remain responsible for all of their respective obligations and liabilities under the other Stadium Agreements (as defined in the Operating Agreement referenced in the Non-Relocation Agreement).

3.      ***Counterparts***.    This Stadium Agreement Assignment and Assumption Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart by facsimile or e-mail is effective as delivery of a manually executed counterpart.

[*Signatures Appear on Next Page*]

IN WITNESS WHEREOF, the parties have executed this Stadium Agreement Assignment and Assumption Agreement as of the date first above written.

**ASSIGNOR**

MIAMI MARLINS, L.P.

By:_____
    Name: David P. Samson
    Title:  President

**ASSIGNEE**

MARLINS TEAMCO LLC

By:_____
    Name: Derek Jeter
    Title:  Chief Executive Officer

IN WITNESS WHEREOF, the parties have executed this Stadium Agreement Assignment and Assumption Agreement as of the date first above written.

**ASSIGNOR**

MIAMI MARLINS, L.P.

By:_____
Name: David P. Samson
Title:   President

**ASSIGNEE**

MARLINS TEAMCO LLC

By:_____
Name: Derek Jeter
Title:   Chief Executive Officer

# EXHIBIT "C"



Proskauer》 Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

Wayne D. Katz
Member of the Firm
d +1.212.969.3071
f 212.969.2900
wkatz@proskauer.com

January 31, 2018

BY FEDEX

County Manager
111 NW 1st St, Suite 2900
Miami, FL 33128
Attention: George M. Burgess

City Manager
444 SW 2nd Avenue, 10th Floor
Miami, FL 33130
Attention: Pedro G. Hernandez

Ladies and Gentlemen:

Pursuant to Section 6 of the Non-Relocation Agreement dated as of April 15, 2009 among Miami-Dade County, the City of Miami and Miami Marlins, L.P. (f/k/a/ Florida Marlins, L.P.) (the "Partnership"), on behalf of the Partnership please find enclosed an examination report prepared by Grant Thornton, the Partnership's independent accountants, including a reasonably detailed calculation of the County/City Equity Payment referred to in the Non-Relocation Agreement.

Yours truly,

Wayne D. Katz

cc:   County Attorney
111 NW 1st St., Suite 2810
Miami, FL 333128
Attn:  Robert A. Cuevas, Jr. and Geri Keenan

City Attorney
444 SW 2nd Avenue, 10th Floor
Miami, FL 33130
Attn:  Julie O. Bru and Olga Ramirez-Sejas



RECEIVED
FEB 0 1 2018
BY:

Beijing | Boca Raton | Boston | Chicago | Hong Kong | London | Los Angeles | New Orleans | New York | Newark | Paris | São Paulo | Washington, DC

Report of Independent Certified Public Accountants

Miami Marlins, L.P.

# Contents

|                                                         | Page  |
|---------------------------------------------------------|-------|
| Report of Independent Certified Public Accountants      | 1     |
| Non-relocation agreement calculation schedule           | 2     |
| Notes to schedule                                       | 3 - 5 |

Attachment A – Non-Relocation Agreement

2018 JAN 32 AM 10: 50
OFFICE OF THE MAYOR


RECEIVED
FEB 0 1 2018
BY:



Grant Thornton LLP
1301 International Parkway, Suite 300
Fort Lauderdale, FL 33323-2874

T 954.768.9900
F 954.768.9908

801 Brickell Avenue, Suite 2450
Miami, FL 33131-4944

T 305.341.8040
F 305.341.8099
GrantThornton.com
linkd.in/GrantThorntonUS
twitter.com/GrantThorntonUS

**REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS**

Miami Marlins, L.P.

We have examined management of Miami Marlins, L.P.'s assertion that Miami Marlins, L.P. complied with the requirements listed in Section 6 of Attachment A [in calculating the County/City Equity Payment] ("specified requirements"). Miami Marlins, L.P.'s management is responsible for its assertion. Our responsibility is to express an opinion on management's assertion about Miami Marlins L.P.'s compliance with the specified requirements based on our examination.

Our examination was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants. Those standards require that we plan and perform the examination to obtain reasonable assurance about whether management's assertion about compliance with the specified requirements is fairly stated, in all material respects. An examination involves performing procedures to obtain evidence about management's assertion. The nature, timing, and extent of the procedures selected depend on our judgment, including an assessment of the risks of material misstatement of management's assertion, whether due to fraud or error. We believe that the evidence we have obtained is sufficient and appropriate to provide a reasonable basis for our opinion.

Our examination does not provide a legal determination on Miami Marlins L.P.'s compliance with the specified requirements.

In our opinion, management's assertion that Miami Marlins, L.P. complied with the requirements listed in Section 6 of Attachment A [in calculating the County/City Equity Payment], is fairly stated, in all material respects.

Grant Thornton LLP

Miami, Florida
January 31, 2018

Grant Thornton LLP
U.S. member firm of Grant Thornton International Ltd

## NON-RELOCATION AGREEMENT CALCULATION SCHEDULE

| | |
|---|---:|
| Contract price | $ 1,200,000,000 |
| Net contractual price adjustments | (21,213,645) |
| Escrow per Transaction | (50,000,000) |
| Gross proceeds | 1,128,786,355 |
| | |
| Less Agreement adjustments: | |
| Assumed value of franchise | 939,046,530 |
| Transaction expenses | 33,372,635 |
| Partners' income tax on sale | 297,428,783 |
| Total Agreement adjustments | 1,269,847,948 |
| | |
| Net Proceeds/(detriment) | $ (141,061,593) |
| | |
| Percentage of Net Proceeds due to County and City | 5% |
| | |
| Total owed to County and City | $ - |

## NOTE A - GENERAL

Miami Marlins, L.P. (the "Partnership") was created pursuant to the laws of the State of Delaware in 1999 and acquired the Florida Marlins baseball franchise (the "Team") and certain other assets in 2002. On November 11, 2011 the Florida Marlins officially changed its name to Miami Marlins and the Partnership changed its name to Miami Marlins, L.P.

The purpose of this schedule is to calculate the Net Proceeds from the sale of the Miami Marlins franchise by the Partnership to Marlins Teamco, LLC ("Buyer") on October 2, 2017 (the "Transaction"). The calculation has been made according to the terms of the Non-Relocation Agreement (the "Agreement") between the Partnership and Miami-Dade County ("County") and the City of Miami ("City") entered into as of April 15, 2009. The Agreement states that upon the sale to a third party of a controlling interest occurring within the period commencing with the approval of the Agreement and ending ten years thereafter, the Team shall or shall cause the seller to pay to the County and City ("County/City Equity Payment"), an amount equal to a percentage of the Net Proceeds of the sale, as defined within the Agreement.

## NOTE B - GROSS PROCEEDS

Gross Proceeds consists of (i) the $1,200,000,000 contract price from the Transaction less (ii) the net amount of certain price adjustments specified in the Transaction agreement and mutually agreed to by both parties to the Transaction and less (iii) the Indemnity Escrow ("Escrow") provided for in the Transaction agreement. The $1,200,000,000 contract price includes $100,000,000 of indebtedness for borrowed money under the MLB League-Wide Facility assumed by the Buyer in the Transaction.

The net contractual price adjustments consist of certain working capital adjustments and other price adjustments that were agreed to by the Partnership and the Buyer as a result of the Transaction which reduced the net proceeds received in the Transaction. If there any amounts that are negotiated after the Transaction date, these obligations will be paid out of the Escrow.

The Escrow of $50,000,000 was deposited in cash by the Buyer with a third party escrow agent to satisfy potential obligations of the Partnership, if any, under the Transaction agreement. Any unpaid and unclaimed amounts will be released to the Partnership in October 2018. As the Escrow amounts have yet to be released and due to the uncertainty of the realization of any escrowed funds, the Escrow has been removed from the Gross Proceeds. As the Escrow funds are released, any funds received by the Partnership would be considered gross proceeds at the time of receipt and the calculation will be subject to revision. Even if the Partnership received all of the Escrow funds, the amount of Net Proceeds would still be $0.

NOTE C - ASSUMED FRANCHISE VALUE

The Partnership calculated the assumed franchise value based on the terms of the Agreement. The base franchise value ("assumed value") provided for by the Agreement was established at $250,000,000 as of the effective date of the Baseball Stadium Agreement (March 3, 2008). The assumed value has been increased to give effect to any additional debt incurred by, or equity capital contributions made to the Partnership and its affiliates. Additionally, the Agreement provides for an imputed increase in value of 8% per annum from the date of the Baseball Stadium Agreement for the calculated assumed value.

| | |
|---|---:|
| Base amount per Agreement | $ 250,000,000 |
| Contributions | 35,000,000 |
| Incremental debt | 279,244,251 |
| Imputed increase at 8% | 374,802,279 |
| Total assumed franchise value | $ 939,046,530 |

From the period of the Baseball Stadium Agreement to the date of the Transaction, there were no equity distributions made from the Partnership and its affiliates.

NOTE D - TRANSACTION EXPENSES

The Partnership, the other Team Affiliates and their direct and indirect owners incurred the following transaction-related expenses to unaffiliated third parties solely as a result of the Transaction:

| | |
|---|---:|
| Financial advisor fee | $ 29,988,850 |
| Legal fees | 2,449,961 |
| Accounting fees | 700,272 |
| Filing fees | 140,000 |
| Other | 93,552 |
| Total transaction costs | $ 33,372,635 |

The financial advisor fee is an amount due to Tallwood Associates, Inc. (or its assignee), an unaffiliated third party, and is calculated based on an agreement executed on January 1, 2000 and clarified and restated on September 21, 2010 between Tallwood Associates, Inc. and the general partner of the Partnership. Pursuant to that agreement, upon the consummation of a sale of the Team, an amount equal to five percent (5%) of the net profits (as defined in the agreement) received by the general partner and its affiliates is due to Tallwood Associates, Inc. (or its assignee). The financial advisor fee would increase upon release of the Escrow funds to the Partnership.

The Partnership will incur additional Transaction expenses that have not been included in the accompanying non-relocation agreement calculation schedule.

## NOTES TO SCHEDULE - CONTINUED

### NOTE E - PARTNERS' INCOME TAX

The Partners' income tax on sale represents the taxes estimated to be payable by the Team affiliates and/or their direct and indirect owners solely as a result of the Transaction. The tax consequences of the Partnership's profits and losses are passed through to the individual partners of the Partnership and are reported in their respective income tax returns. The Partnership is subject to filing tax returns in various states and the U.S. federal jurisdiction.

The partners' income tax calculation was prepared by a reputable, global accounting firm that has prepared the Partnership's tax returns for many years. The tax calculation represents the taxes that would be payable by the partners solely as it relates to the Transaction. The preparation of the tax calculation for the partners involved certain estimates and assumptions that the accounting firm deemed reasonable based on the facts of the Transaction, the Partnership's tax return filings for prior periods and the partners' filing status as confirmed to the accounting firm by the partners.

### NOTE F - PERCENTAGE OF NET PROCEEDS DUE TO COUNTY AND CITY

In accordance with the Agreement, the percentage of Net Proceeds due to the County and City shall be determined based on the phase of the project and the years elapsed from the date of the Agreement to the date on which the Team is sold. The ballpark was substantially completed on March 30, 2012 and as of the date of the Transaction, the Team was in year 6 of the "Operational Phase" per the Agreement. The Agreement calls for calculation of Net Proceeds due to the County and City to be calculated at 5% during year 6 of the "Operational Phase".

ATTACHMENT A

## Non-Relocation Agreement

- The purpose of the Non-Relocation Agreement is to recognize the significant investment made by all parties into this project and give the County and City comfort that the Team will be committed to this community long after the baseball stadium is constructed.

- In addition to agreeing to at least a 35-year term, the Team covenants to discontinue relocation discussions with other potential venues until near the end of the Term of this Agreement.

- The Team also covenants that, except under extraordinary circumstances, the principal place of business (offices) for the Marlins and, its home stadium for regular season and playoff games, will be at this baseball stadium in the City of Miami.

- The Team will change its name to the Miami Marlins prior to opening of the baseball stadium.

- Included in this Agreement is the "Payment Upon Sale of Team" provision. This is the provision that sets timeframes whereby if the Team were to sell more than 50% of the controlling interest in the franchise, the County and City would receive a percentage equity payment as a result of the Team selling the franchise for a profit immediately after the Stadium Agreements are approved, or, shortly thereafter.

- The provision becomes effective concurrent with the Stadium Agreements and would last ten (10) years, or, six years after the stadium is constructed. The payout period has been extended from 5 to 10 years, and, the percentage payout has been increased as shown below.

| If the sale occurs in: | BSA Plan | Jan. 09 Plan | Current Plan |
|---|---|---|---|
| Year 1 | 10.0% | 18.0% | 70.0% |
| Year 2 | 9.0% | 16.2% | 60.0% |
| Year 3 | 7.0% | 14.4% | 50.0% |
| Year 4 | 6.0% | 12.6% | 30.0% |
| Year 5 | 5.0% | 10.0% | 10.0% |
| Year 6 | 0.0% | 7.5% | 7.5% |
| Year 7 | 0.0% | 5.0% | 5.0% |
| Year 8 | 0.0% | 0.0% | 5.0% |
| Year 9 | 0.0% | 0.0% | 5.0% |
| Year 10 | 0.0% | 0.0% | 5.0% |

- Circumstances that would allow games to be played at other stadiums are limited, but could include: 1) severe damage to the stadium, 2) MLB requesting or permitting a limited number of regular season home games to be played in another location or, 3) MLB requests games other than playoffs or regular season games to be played at another location.

- As an inducement to the Team's compliance with the Non-Relocation provisions of this Agreement, and in light of the irreparable harm that could become of the City and the County in the event of a default of this Agreement, legal remedies such as injunctive or equitable relief are available, and, if not granted the County and City would be entitled to seek liquidated damages on the outstanding balance of principal and interest on the County bonds, or, actual damages incurred by the County and the City in constructing the Stadium.

335

## NON-RELOCATION AGREEMENT

This Non-Relocation Agreement (this "Agreement") is made and entered into as of this /5ᵗʰ day of April, 2009, by and among Miami-Dade County, a political subdivision of the State of Florida (the "County"), the City of Miami, a municipal corporation of the State of Florida (the "City"), and Florida Marlins, L.P., a Delaware limited partnership (the "Team"). The County, City and the Team shall be referred to herein collectively as the "Parties" and individually as a "Party".

### Recitals

A.    The Team owns the Major League Baseball franchise known as the Florida Marlins.

B.    Contemporaneously with the execution of this Agreement, (i) the County, the City and Marlins Stadium Developer, LLC, an affiliate of the Team, are entering into a Construction Administration Agreement (the "Construction Agreement") providing for the planning, design and construction of the Baseball Stadium and the Public Infrastructure; and (ii) the County, the City and Marlins Stadium Operator, LLC, another affiliate of the Team (the "Stadium Operator"), are entering into an Operating Agreement (the "Operating Agreement") providing for the operation and management of the Baseball Stadium by the Stadium Operator. (Capitalized terms used but not defined in this Agreement have the meanings set forth in the Operating Agreement.)

C.    As a material inducement to the County and the City to enter into the Construction Agreement and the Operating Agreement, the Team has agreed to enter into this Agreement to assure that the Team will play its MLB home games at the Baseball Stadium on the terms and conditions set forth herein.

NOW, THEREFORE, the parties agree as follows:

1.    **Discontinuation of Relocation Discussions.** Subject to Sections 2(d) and 3 below, the Team covenants and agrees that from the date of this Agreement and continuing through the earlier of (i) the Non-Relocation Term (as defined in Section 2 below) and (ii) the termination of this Agreement pursuant to Section 5.5, the Team and its agents shall discontinue all discussions, negotiations and efforts to relocate the Team's MLB franchise either temporarily or permanently to any location other than the Baseball Stadium for the period following the Substantial Completion of the Baseball Stadium.

2.    **Covenant to Play at Baseball Stadium.** Subject to Section 3 below, the Team covenants and agrees that throughout the Non-Relocation Term:

(a)    the Team shall maintain its principal place of business in the City;

(b)    the Team shall maintain its MLB franchise in the City and use the Baseball Stadium as its home stadium; contraction of the Team by Major League Baseball shall

*336*

be deemed a violation of this clause; the Team shall not volunteer for contraction or vote in favor of its contraction;

(c)     the Team shall play all of its regular season and playoff (including World Series) MLB Home Games at the Baseball Stadium; and

(d)     the Team shall not enter into any contract or agreement, or make any request or application to Major League Baseball, to (i) relocate its franchise outside of the City in violation of clause (b) above or (ii) play any regular season or playoff MLB Home Game in any location other than the Baseball Stadium in violation of clause (c) above, provided that the Team may take the actions otherwise prohibited in this subsection (d) during the last three (3) years of the Term of the Operating Agreement in connection with any proposed relocation or playing of MLB Home Games that would not occur until the conclusion of the Term. The Team shall notify the County and City promptly after entering into any such contract or agreement, or making any such request or application. The covenants by the Team under this Section 2 are collectively referred to in this Agreement as the "Non-Relocation Covenants" and any violation of any of such covenants is referred to as a "Non-Relocation Default".

As used in this Agreement, "Non-Relocation Term" means the period commencing with the Substantial Completion Date and ending on the termination of this Agreement pursuant to Section 5.5 of this Agreement.

3.     **Exceptions.** Notwithstanding Sections 1 and 2 above, the Team shall be permitted to play what would otherwise be an MLB Home Game at a location other than the Baseball Stadium:

(a)     in the case of an Alternate Site Condition as provided in Section 4;

(b)     in any consecutive five-year period, up to three (3) regular season MLB home games (not including any games played in different locations under Section 3(a) above) in an international or other location as permitted or requested by Major League Baseball;

(c)     in the case of playoff MLB games, at any location required by Major League Baseball; and

(d)     in the case of MLB games other than regular season and playoff games, at any location it chooses.

If the Substantial Completion Date occurs during an MLB season after one-half of the Team's regular season games have been played, the covenants in Section 1 shall not apply with respect to that MLB season, and the covenants in Section 2 shall not become effective until the start of the succeeding MLB season.

The Team may take any actions otherwise prohibited by Section 1 or 2 in connection with any change in location permitted by this Section 3.

Without limiting the generality of any other provision of this Agreement, the covenants of the Team provided in Sections 1 and 2 shall not apply if (i) the County and the City

Representatives jointly consent in a writing signed by both parties to any action(s) otherwise prohibited under such section; except that any actions which would allow the Team to permanently relocate from the City shall require the approval of the City Commission and the Board of County Commissioners, or (ii) at any time after the termination of this Agreement.

4. **Alternate Site Condition.**

(a) Notwithstanding the provisions of Section 1 or Section 2, if, at any time during the Non-Relocation Term, an Alternate Site Condition shall exist, then (i) the Team shall be entitled to make arrangements to temporarily play at alternate sites for the Team's MLB Home Games and (ii) the Team shall be relieved of its obligations under Sections 1 and 2 and shall be entitled to play its MLB Home Games at such alternate sites, but only during the period of time that any such Alternate Site Condition shall exist; provided, however, that if the Alternate Site Condition shall be of such a nature that its expected expiration cannot reasonably be ascertained by the Team, then the Team shall be entitled to honor any commitment it might reasonably have made to play MLB Home Games at an alternate site even if that commitment extends beyond the date such Alternate Site Condition ends. However, if the County or the City obtain or possess reasonable evidence that the expiration of the Alternate Site Condition can be ascertained, either Party may seek to have such matter determined by Arbitration pursuant to Article 18 of the Operating Agreement. The Team shall not, however, make any commitment that extends beyond the end of the MLB Season in or prior to which such Alternate Site Condition occurs, except that, if, as of December 1 of any Operating Year, such Alternate Site Condition is reasonably expected (as determined in accordance with Section 4(b)) to continue for more than sixty (60) days of any subsequent MLB season, then the Team shall be entitled to commit to play its home games at an alternate site for the duration of such MLB season.

(b) Not later than November 1 of any Operating Year in which an Alternate Site Condition continues to exist, the Team shall give the County and City Representatives a written notice setting forth the date it reasonably believes such Alternate Site Condition will terminate (the "Proposed Date"). If the City or County Representative fails to object to such notice within five (5) Business Days, it will be deemed to have accepted the Proposed Date and the Team's right to contract with alternate sites under Section 4(a) shall be based on such date. If the County or City Representative timely objects to the Proposed Date, the Parties shall use good faith efforts to resolve such dispute within the next five (5) Business Days. If the dispute cannot be resolved, either Party may seek to have such date determined by Arbitration pursuant to Article 18 of the Operating Agreement and such panel shall be directed to seek to hear and resolve the dispute by the immediately succeeding December 1. Any determination by the Arbitrator Panel shall be final, binding and non-appealable by the Parties for purposes of determining the Team's right to contract with alternate sites under Section 4(a). The County, the City and the Team shall consult, and reasonably cooperate, with one another following any Alternate Site Condition so that the Team can most effectively find and contract for an alternate site during the duration of such Alternate Site Condition.

(c) The Team shall use commercially reasonable and diligent efforts to mitigate and overcome any Alternate Site Condition that results in its regular season or playoff MLB Home Games not being played at the Baseball Stadium to the extent such event or condition is within the reasonable control of the Team, but this undertaking shall not be

3

*338*

construed to require the Team to take any action, or to relieve the County or the City of any obligation it may have, with respect to a Condemnation Action, Casualty or Force Majeure that is the County's or City's responsibility under the Operating Agreement or require the Team to take any action with respect to strikes, labor unrest or disputes, or take any action that the Operator is not required to take under the Operating Agreement.

(d)    As used in this Agreement, "Alternate Site Condition" shall mean the existence of any one of the following:

(i)    Major League Baseball determines the condition of the Stadium Premises is or may be (e.g., due to an impending or recently occurring storm) such that MLB Rules and Regulations, or a specific Major League Baseball directive, prohibits the playing of MLB Home Games at the Baseball Stadium in a written direction, declaration or ruling addressed to the County, the City and the Team; or

(ii)    a Governmental Authority determines the use or occupancy of any material portion of the Stadium Premises (excluding the Plaza) is (a) not permitted under any Applicable Law or (b) is unsafe for customary usage.

5.    Remedies.

5.1    Non-Relocation Default.    Upon the occurrence of a Non-Relocation Default, each of the County and the City shall have the option to pursue any one or more of the remedies set forth in Section 5.2, Section 5.3 or Section 5.4, that may be applicable. Upon the occurrence of any other breach or misrepresentation in this Agreement by the Team, each of the County and the City shall have the option to pursue any one or more of the remedies set forth in Section 5.4.

5.2    Declaratory or Injunctive Relief.    Upon the occurrence of a Non-Relocation Default, each of the County and the City shall be entitled to seek injunctive relief prohibiting or mandating action by the Team in accordance with, or declaratory relief with respect to, the Non-Relocation Covenants. In addition, the Team: (a) acknowledges that the Non-Relocation Covenants are an essential part of the bargain and consideration of the Stadium Agreements and are necessary to protect the business and goodwill of the County and the City; (b) recognizes that the Baseball Stadium is being constructed and certain debt is being incurred by the County and the City to permit the MLB Home Games in the Baseball Stadium during the Non-Relocation Term; (c) recognizes that having the Team play its MLB Home Games in the Baseball Stadium throughout the Non-Relocation Term provides a unique value to each of the County and the City, including generating new jobs, additional revenue sources and economic development and increased tourism for the County and the City; and (d) acknowledges and agrees that any breach by the Team of the Non-Relocation Covenants shall cause irreparable and continual harm to the County and the City and that damages for a default under such Non-Relocation Covenants cannot be estimated with any degree of certainty and that monetary damages cannot fairly or adequately compensate the County and the City for a breach of such Non-Relocation Covenants. Accordingly, the Team agrees that, in the event of any of the actual or threatened breach by the Team of any one of the Non-Relocation Covenants (i) each of the County and the City shall be entitled to seek and obtain, a temporary restraining order, together

4

with temporary, preliminary and permanent injunctive or other equitable relief, from any court of competent jurisdiction, to restrain or enjoin any actual or threatened breach by the Team of any Non-Relocation Covenant without the necessity of posting a bond or other security and without any further showing of irreparable harm, balance of harms, consideration of the public interest or the inadequacy of monetary damages as a remedy, (ii) the administration of an order for injunctive relief would not be impractical and, in the event of any breach of any Non-Relocation Covenant by the Team, the balance of hardships would weigh in favor of entry of injunctive relief, and (iii) each of the County and the City may enforce any Non-Relocation Covenant contained in this Agreement through specific performance. The Parties hereby agree and irrevocably stipulate that (x) the rights of each of the County and the City to injunctive relief pursuant to this Non-Relocation Agreement shall not constitute a "claim" pursuant to section 101(5) of the United States Bankruptcy Code (the "Bankruptcy Code") and shall not be subject to discharge or restraint of any nature in any bankruptcy proceeding involving the Team, (y) this Agreement is not an "executory contract" as contemplated by section 365 of the Bankruptcy Code, and (z) action(s) taken by each of the County and the City pursuant to this Section 5.2 shall not in any way prejudice any other rights or remedies that the County and the City may have under Section 5.3 or Section 5.4 of this Agreement or under the other Stadium Agreements if a court of competent jurisdiction fails to provide injunctive or other equitable relief prohibiting the Team's violation of the Non-Relocation Covenants or, in the case of the remedies set forth in Section 5.4, fails to award liquidated damages under Section 5.3.

    5.3    <u>Liquidated Damages</u>. The Parties acknowledge and agree that if the County or the City do not obtain injunctive or other equitable relief pursuant to Section 5.2, the County and the City each shall be entitled to seek and obtain relief pursuant to this Section 5.3 in the event a court of competent jurisdiction determines, in a final and non-appealable order, that the Team has breached its covenants under Section 2(c) (a "<u>Final Order</u>"). The Parties also recognize, agree, and stipulate that the financial, civic, and social benefits to the County and the City from the presence of the Team and the playing of its MLB Home Games in Miami, Florida are great, but that the precise value of those benefits cannot be estimated with any degree of certainty due to the number of citizens and businesses that rely upon and benefit from the presence of the Team in Miami, Florida. Accordingly, the magnitude of the damages that would result from a breach of Section 2(c) hereof that is not enjoined by a court of competent jurisdiction notwithstanding the intent of the parties, would be very significant in size but are not readily ascertainable and would include damages to the reputation and finances of the County and the City. Therefore, the Parties agree that in the event of a violation of Section 2(c) hereof, including, without limitation, any such breach arising pursuant to the provisions of section 365(g) of the United States Bankruptcy Code or similar provision of any successor thereto, the County and the City will be entitled to recover from the Team the amounts set forth in Subsection 5.3.1:

    5.3.1    <u>Liquidated Damages</u>. If the County or the City do not obtain injunctive or other equitable relief pursuant to Section 5.2 and the violation of Section 2(c) is not cured prior to the date that a court of competent jurisdiction enters a Final Order, the County shall be entitled to receive, as reasonable estimated liquidated damages and not as a penalty, the County Liquidated Damages (as hereafter defined) and the City shall be entitled to receive, as reasonable estimated liquidated damages and not as a penalty, the City Liquidated Damages (as hereafter defined). For purposes of this Agreement, "County Liquidated Damages" shall mean

5

the sum of (a) the then outstanding balance of principal and interest of the County Bonds (as such term is defined in the Construction Administration Agreement), (b) the unamortized amount of Public Infrastructure Costs and any other costs for the Baseball Stadium Project paid by the County under the Construction Administration Agreement (which amount shall be amortized on a straight line basis over 30 years) without duplicating amounts in (a) if such Public Infrastructure Costs or other costs are funded from County Bonds, and (c) the present value of all Capital Reserve Fund contributions required to be made by the Stadium Operator pursuant to Section 9.3(b) of the Operating Agreement. For purposes of this Agreement, "City Liquidated Damages" shall mean the sum of (i) the then outstanding balance of principal and interest of the City Bonds (as such term is defined in the Construction Administration Agreement), (ii) the unamortized balance of the funds (other than the proceeds of the City Bonds) deposited in the City Account (as such term is defined in the Construction Administration Agreement) in an amount that, together with proceeds of the City Bonds, will be equal to $13,000,000 (which balance shall be amortized on a straight line basis over 30 years), (iii) the present value of all regular season MLB Home Game parking fees owed to the City under Section 6.3(a) of the City Parking Agreement (assuming 81 regular season MLB Home Games) prior to the end of the Term (as such term is defined in the City Parking Agreement), and (iv) the unamortized amount of Public Infrastructure Costs and any other costs for the Baseball Stadium Project paid by the City under the Construction Administration Agreement (which amount shall be amortized on a straight line basis over 30 years), without duplicating amounts in (i) and (ii) if such Public Infrastructure Costs or other costs are funded from City Bonds or amounts referred to in (ii).

5.3.2  **Present Value.**  All calculations of the present value of any unpaid amounts to be made by the Team under this Section 5.3 shall use a discount rate of seven percent (7%) per annum.

5.3.3  [Intentionally Omitted]

5.3.4  **Acknowledgement.**  The Parties hereby acknowledge that they have negotiated the amounts set forth in this Section 5.3 in an attempt to make a good faith effort in quantifying the amount of damages due to a violation of Section 2(c) hereof despite the difficulty in making such determination.

5.4  **Actual Damages.**  In the event of any breach of or misrepresentation in this Agreement by the Team (other than a Non-Relocation Default subject to the remedies set forth in Section 5.2 or, if applicable, Section 5.3), or in the event of a Non-Relocation Default for which, notwithstanding the intent of the Parties, the County and the City are unable to obtain the relief set forth in Section 5.2 or, if applicable, Section 5.3, the County and the City shall have the right (i) to institute any and all proceedings or claims permitted by law or equity to recover any and all amounts necessary to compensate the County and the City for all damages proximately caused by the Team's breach under this Agreement, and (ii) to institute any and all proceedings or claims permitted by law or equity to compel specific performance with respect to the Team's obligations under this Agreement and one or more actions to seek and obtain a temporary restraining order, together with such other temporary, preliminary and permanent injunctive or other equitable relief, from any court of competent jurisdiction capable of issuing or granting such relief, to compel the Team to comply with or refrain or cease from breaching or violating the terms, covenants and conditions of this Agreement.

### 5.5    Termination.

(a)    Upon the entry of a Final Order with respect to a default by the Team under Section 2(c), the County and the City shall have the right, but not the obligation, to give to the Team joint written notice (a "Final Notice") of their intention to terminate this Agreement and all other Stadium Agreements. After the expiration of a period of thirty (30) days from the date such Final Notice is given, unless the default is cured, this Agreement and the other Stadium Agreements may, at the sole option of the County and the City, be terminated without liability to the County and the City by further written notice to the Team. If, however, within such thirty (30) day period, the Team's default under Section 2(c) is cured, then this Agreement and the other Stadium Agreements shall not terminate by reason of such Final Notice.

(b)    This Agreement, and all obligations of the Parties under this Agreement, shall terminate without further action by, or liability to, any Party upon the expiration or termination of the Operating Agreement for any reason expressly permitted under the Operating Agreement; provided that upon a termination of the Operating Agreement jointly by the County and the City upon the entry of a Final Order that the Team has breached Section 2(c) of this Agreement, this Agreement shall only terminate as provided in Section 5.5(a) above. For the avoidance of doubt, until the end of the Non-Relocation Term, the Team shall remain bound by, and shall not be relieved of, its obligations under this Agreement upon a termination by the County and the City of the Operating Agreement due to a breach of Section 2(c) of this Agreement by the Team as described in the preceding sentence. Except for the provisions of this Agreement that are expressly to survive termination, and except as provided in this Section 5.5(b), in the event of a termination of this Agreement and the other Stadium Agreements under this Section 5.5, then all obligations of the Parties under this Agreement and such other Stadium Agreements automatically also shall terminate.

(c)  .  Termination of this Agreement and the other Stadium Agreements shall not alter any existing claim of any Party for breaches of this Agreement or the other Stadium Agreements occurring prior to such termination and the obligations of the Parties thereto with respect to such existing claims shall survive termination, including, without limitation, the obligations under Sections 5.1, 5.2, 5.3 and 5.4 hereof.

### 5.6    Cumulative Remedies.  Except as expressly set forth in Section 5.2, Section 5.3 and Section 5.4, each right or remedy of the County and the City provided for herein shall be cumulative of and shall be in addition to every other right or remedy of the County and the City provided for in this Agreement, and the exercise (or the beginning of the exercise) by the County and the City of any one or more of the rights or remedies provided for in this Agreement, shall not preclude the simultaneous or later exercise by the County and the City of any or all other rights or remedies provided for in this Agreement or any other Stadium Agreement or hereafter existing at law or in equity, by statute or otherwise.

### 6.    Payment Upon Sale of Team.  Upon a sale to a third party of a "control interest" (defined as the sale of more than 50% of the voting, actual or beneficial interest in the Marlins franchise, occurring within the period commencing with the approval of the Stadium Agreements by the City Commission and the Board of County Commissioners and ending ten (10) years

thereafter (not to exceed 72 months following Substantial Completion), whether through a sale of equity shares or partnership interests, a sale of substantially all of the Team's assets or a merger, consolidation, joint venture or similar change of control transaction, to the extent proceeds are paid to the holders of equity securities of the Team and not contributed in the ordinary course of business to Team Affiliates involved in baseball related businesses) (other than following the death of the controlling owner), the Team shall or shall cause the seller to pay to the County and the City, to be split on a pro-rata basis (including the value of the City's contribution of the Baseball Stadium Site, the amount of the City's and the County's expenditures as required by the Construction Agreement, and the value of the City and the County's respective expenditures associated with the Public Infrastructure) determined by each respective parties' contribution to the Baseball Stadium, an amount equal to the following percentage of the Net Proceeds of the sale that are attributable to any increase in value of the franchise (pro-rated in the case of a sale of the control interest) (the "County/City Equity Payment"):

| Phase of Project | Year | Description of Time-Frame | Percentage |
|---|---|---|---|
| Construction Phase | Year 1 | If sale occurs within 12 months of approval date of Stadium Agreements | 70% |
| Construction Phase | Year 2 | Sale occurs within 24 months of approval date of Stadium Agreements | 60% |
| Construction Phase | Year 3 | Sale occurs within 36 months of approval date of Stadium Agreements | 50% |
| Construction Phase | Year 4 | Sale occurs within 48 months of approval date of Stadium Agreements, or, prior to Substantial Completion of Stadium, whichever occurs first | 30% |
| Operational Phase | Year 1 | Sale occurs within 12 months of Substantial Completion | 10.0% |
| Operational Phase | Year 2 | Sale occurs within 24 months of Substantial Completion | 7.5% |
| Operational Phase | Year 3 | Sale occurs within 36 months of Substantial Completion | 5.0% |
| Operational Phase | Year 4 | Sale occurs within 48 months of Substantial Completion | 5.0% |
| Operational Phase | Year 5 | Sale occurs within 60 months of Substantial Completion | 5.0% |
| Operational Phase | Year 6 | Sale occurs within 72 months of Substantial Completion | 5.0% |

The increase in value shall be based on an assumed value of the franchise of $250,000,000 as of the date of the BSA, which assumed value shall be increased to give effect to any additional debt incurred by, or equity capital contributions made to the Team, Stadium Developer or Operator,

8

343

including the capital contributions made to, or the debt incurred by, the Stadium Developer or the Team pursuant to the Construction Administration Agreement (net of distributions to any such Team owners) and an imputed increase in value of 8% per annum from the date of the BSA. "Net Proceeds" shall mean the fair market value of all proceeds received from the sale plus any indebtedness for borrowed money of the Team or any Team Affiliate assumed by the buyer in the sale, less (x) the assumed value of the franchise determined under the preceding sentence, (y) all transaction-related expenses and taxes payable by the Team Affiliates and/or their direct and indirect owners to unaffiliated third parties solely as a result of the sale, and (z) any liabilities or obligations retained by the Team (in the case of a sale of the franchise) and/or its direct or indirect owners relating to the Marlins or its affiliated businesses.

The Team shall cause its independent accountants to provide the County and City a reasonably detailed calculation of the County/City Equity Payment (on a combined basis) under this Section 6, including a detailed calculation showing the assumed value, Net Proceeds and any other calculations the Team used to determine the amount payable, as promptly as practicable following any applicable sale. If the County or City do not provide a notice of objection within thirty (30) days after receiving the accountant's calculation, such calculation shall be final and binding and payment of any amount due shall be made not later than thirty (30) days after the expiration of such period. If the County or City does provide a notice of objection, it shall specify in reasonable detail the basis for its objections. The objecting Government Party and the Team shall then seek to resolve any disagreements between them within the succeeding period of sixty (60) days. If the objecting Government Party and the Team are unable to resolve the dispute within such sixty (60) day period, each of them shall have the right to commence arbitration in accordance with the Operating Agreement. If the arbitrator shall enter a final, non-appealable order requiring payment from the Team under this Section 6, the Team shall pay such amount within thirty (30) days thereafter.

7. **Annual Payment.** In consideration for its use of the Baseball Stadium, the Team shall remit to the County an annual amount of $2,300,000 per year, growing at two percent (2%) per year, for each Operating Year during the Initial Term of the Operating Agreement, in semi-annual installments of $1,150,000 (growing at 2% annually) on April 30 and September 30 of each Operating Year; provided, however, that if Substantial Completion occurs after April 30 but before September 30 in the first Operating Year, then the Team shall remit to the County $1,150,000 within thirty (30) days following Substantial Completion and $1,150,000 on or before September 30, and if Substantial Completion occurs after September 30, the Team shall remit to the County $2,300,000 within thirty (30) days of Substantial Completion but in no event later than October 31 for the first Operating Year. Such annual amount shall be negotiated by the Team and the County prior to the commencement of any Renewal Term. Notwithstanding any other provisions of this Agreement or of the Operating Agreement relating to termination, this Section 7 shall survive any early termination of this Agreement and the Operating Agreement arising from the Operator's termination of the Operating Agreement pursuant to Section 17.5.3 of the Operating Agreement.

8. **Indemnification by the Team.** The Team shall indemnify and hold harmless the City and the County and each and all of its directors, officers, employees, agents, licensees, independent contractors and consultants or any of them as their interests may appear (collectively, "Government Indemnitees"), of, from and against all claims, fines, claim costs,

charges and expenses, liabilities, suits, obligations, demands, actions, settlements, and judgments recovered from any of them, including attorneys' fees incurred to defend such claims (collectively, "Losses"), to the extent such Losses arise from any breach of this Agreement by the Team. Any such indemnification shall be provided in accordance with the indemnification procedures set forth in Section 13.3 of the Operating Agreement. The Team expressly understands and agrees that any insurance protection required by this Agreement or otherwise provided by the Team shall in no way limit the responsibility to indemnify, keep and save harmless and defend the Government Indemnitees as herein provided.

9. **Change of Name** The Team shall change its name to the "Miami Marlins" prior to the Substantial Completion Date and shall continue to use that name for the Term of the Operating Agreement, including any Renewal Term.

10. **Governing Law; Interpretation**. This Agreement has been negotiated, executed and delivered in Florida, and shall be governed by the laws of the State of Florida without reference to the conflicts of law principles of that State. Venue for any judicial, administrative or other action to enforce or construe any term of this Agreement or arising from or relating to this Agreement shall be exclusively in Miami, Florida. The headings of sections and paragraphs in this Agreement are for convenience only and shall not be construed in any way to limit or define the content, scope or intent of the provisions hereof. As used in this Agreement, the singular shall include the plural, and masculine, feminine and neuter pronouns shall be fully interchangeable where the context so requires. If any provision of this Agreement, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein. Time is of the essence of this Agreement. Any and all claims, demand or other actions related to this Agreement shall be subject to the exclusive jurisdiction of United States District Court of the Southern District of Florida. The Parties irrevocably submit to such jurisdiction.

11. **Entire Agreement**. This Agreement and the other Stadium Agreements contain the sole and entire agreement among the Parties and their Affiliates with respect to their subject matter, are fully integrated, and supersede all prior written or oral agreements among them relating to that subject matter, including the BSA. This Agreement may not be modified, amended or waived except by a written instrument signed by each of the parties affected thereby, and approved by the Board and the City Commission, if applicable. Waiver by any Party of any breach of any provision of this Agreement shall not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or other provision of this Agreement. This Agreement shall terminate upon the conclusion of the Term of the Operating Agreement.

12. **Representations and Warranties**. The Team hereby represents and warrants to the County and the City as follows:

(a) the execution, delivery and performance by the Team of this Agreement have been duly authorized by all necessary limited partnership action, and do not and will not contravene or conflict with (i) the limited partnership agreement of the Team, (ii) any provision of Baseball Rules and Regulations, (iii) any law, order, rule, regulation, writ, injunction or decree now in effect of any government, governmental instrumentality or court having jurisdiction over

10
345

the Team, or (iv) any loan agreement or other contractual restriction binding on or affecting the Team or any of its property or assets, except where any of the foregoing could not reasonably be expected to have a material adverse effect on the Team;

(b)     this Agreement is a legal, valid and binding obligation of the Team enforceable against the Team in accordance with its terms;

(c)     except as disclosed in writing to the County or the City, there is no action, proceeding or investigation pending or, to the knowledge of the Team, threatened or affecting the Team, which may adversely affect the ability of the Team to fulfill and perform its obligations and its other undertakings under this Agreement. The Team is not in default with respect to any judgment, order, injunction or decree of any Governmental Authority which is in any respect material to the transactions contemplated in and by this Agreement;

(d)     the Team is a limited partnership duly formed, validly existing, and in good standing under the laws of the State of Delaware;

(e)     the Team is a member in good standing of Major League Baseball and is in compliance in all material respects with all applicable Baseball Rules and Regulations which are relevant to the transactions contemplated herein; and

(f)     the Team has full power and legal right to execute and deliver this Agreement and to perform and observe the provisions of this Agreement.

13.     **Team Acknowledgment.**     The Team hereby acknowledges that pursuant to Section 15.3(i) of the Operating Agreement, in the event there are any unpaid obligations under the Operating Agreement for which the Operator shall not have adequate reserves or reasonably anticipated revenues arising from Revenue Rights, and which are not being contested by the Operator in good faith, the Operator has covenanted and shall not make any further payments to the Team under its license agreement with the Team or any distributions of stadium revenues to the Team Affiliates and/or its partners until all such obligations have been fully satisfied.

14.     **Successors and Assigns; Third Party Beneficiaries.**

(a)     This Agreement shall bind the Team and its assigns and successors; provided that the Team shall not be entitled to transfer or assign its obligations hereunder without the prior written consent of the Government Parties, which consent shall be in their sole discretion; provided, further, however, that the Team may, without the prior written consent of the Government Parties, transfer and assign its obligations hereunder to any Person (or Affiliate of any Person) that acquires the Team's MLB franchise with the required approval of Major League Baseball, provided that (i) such transferee assumes unconditionally, in a writing reasonably satisfactory to the Government Parties, all of the obligations of the Team under this Agreement, and (ii) such transferee or its Affiliates assume all of the other obligations of the Stadium Operator and its Affiliates under the Stadium Agreements.

(b)     This Agreement shall bind the Government Parties and their respective assigns and successors; provided that neither of the Government Parties may transfer or assign

this Agreement or any of their respective rights and obligations hereunder without the prior written consent of the Team, which consent shall be in the Team's sole discretion.

(c)     Nothing in this Agreement, express or implied, is intended to (a) confer upon any Person other than the parties and their permitted successors and assigns any rights or remedies under or by reason of this Agreement as a third-party beneficiary or otherwise; or (b) authorize anyone not a party to this Agreement to maintain an action pursuant to or based upon this Agreement.

15.     **Nonrecourse Liability of Team Personnel**.  Notwithstanding and prevailing over any contrary provision or implication in this Agreement and except for their criminal acts with respect to this Agreement (i.e., acts which would constitute crimes were they prosecuted for and convicted of such acts), the officers, directors, partners, shareholders, members, employees and agents of the Team and their Affiliates (the "Team Personnel") shall not in any way be liable under or with respect to this Agreement; no deficiency or other monetary or personal judgment of any kind shall be sought or entered against any of the Team Personnel with respect to liability under or with respect to this Agreement; no judgment with respect to liability under or with respect to this Agreement shall give rise to any right of execution or levy against the assets of any of the Team Personnel; and the liability of the Team under this Agreement shall be limited to the assets of the Team.

16.     **Notices**.  Any notice, consent or other communication under this Agreement shall be in writing and shall be considered given when delivered in person or sent by facsimile or electronic mail (provided that any notice sent by facsimile or electronic mail shall simultaneously be sent personal delivery, overnight courier or certified mail as provided herein), one Business Day after being sent by reputable overnight carrier, or three Business Days after being mailed by certified mail, return receipt requested, to the parties at the addresses set forth below (or at such other address as a party may specify by notice given pursuant to this Section to the other parties):

To the County:          County Manager
                        111 NW 1st Street, Suite 2900
                        Miami, Florida 33128
                        Attention:  George M. Burgess

with a copy to:         County Attorney
                        111 NW 1st Street, Suite 2810
                        Miami, Florida 33128
                        Attention:  Robert A. Cuevas, Jr. and Geri Keenan

To the City:            City Manager
                        444 SW 2nd Avenue, 10th Floor
                        Miami, Florida 33130
                        Attention: Pedro G. Hernandez

12

347

|  |  |
|---|---|
| with a copy to: | City Attorney |
|  | 444 SW 2nd Avenue, 10th Floor |

with a copy to:  City Attorney
444 SW 2nd Avenue, 10th Floor
Miami, Florida 33130
Attention: Julie O. Bru and Olga Ramirez-Seijas

To the Team:  2267 Dan Marino Boulevard
Miami, Florida 33056
Attention: David Samson and Derek Jackson

with a copy to:  Proskauer Rose LLP
1585 Broadway
New York, New York 10036
Attention: Wayne D. Katz, Esq.

17.  **Subordination**. The Team acknowledges and agrees that its right to receive any payments from the Stadium Operator (including equity distributions) shall be subordinate to the Stadium Operator's payment obligations under the Operating Agreement.

18.  **Severability**. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under Applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under Applicable Law, the Parties shall, to the extent possible, negotiate a revised provision which (a) complies with Applicable Law, (b) does not alter any of the substantive rights, obligations or liabilities of any party under this Agreement or any other Stadium Agreement, and (c) confers upon the Parties the benefits intended to be conferred by the invalid provision; and the remaining provisions of this Agreement, if capable of substantial performance, shall be enforced as if this Agreement was entered into without the invalid provision.

19.  **County Inspector General and Commission Auditor**. The attention of the Operator is hereby directed to Section 2-1076 of the County Code establishing the Miami-Dade County Office of the Inspector General (the "OIG"), which has the authority and power to investigate County affairs and review past, present and proposed County programs, accounts, records, contracts and transactions. The OIG contract fee shall not apply to this Agreement or any other Stadium Agreement, and the Team Affiliates shall not be responsible for any expense reimbursements or other amounts payable to the OIG or its contractors. The attention of the Operator is hereby directed to Section 2-481 of the County Code related to the Commission Auditor.

20.  **Sovereign Rights**. The County and City retain all of their respective sovereign prerogatives and rights as a county or city under State law with respect to the planning, design, construction, development and operation of the Baseball Stadium. It is expressly understood that notwithstanding any provisions of this Agreement and the Stadium Agreements and the County's and the City's status thereunder:

13

*348*

(a)    The County and the City retain all of their sovereign prerogatives and rights and regulatory authority (quasi-judicial or otherwise) as a county or city under State law and shall in no way be estopped from withholding or refusing to issue any approvals of applications for building, zoning, planning or development under present or future laws and regulations whatever nature applicable to the planning, design, construction and development of the Baseball Stadium, the Baseball Stadium Site, the Public Infrastructure, the Other Development or the Parking Facilities, or the operation thereof, or be liable for the same; and

(b)    The County and the City shall not by virtue of this Agreement or the other Stadium Agreements be obligated to grant the other, or the Team, any Team Affiliate, or the Stadium Developer any approvals of applications for building, zoning, planning or development under present or future laws and ordinances of whatever nature applicable to the planning, design, construction, development and/or operation of the Baseball Stadium, the Baseball Stadium Site, the Public Infrastructure, the Other Development or the Parking Facilities.

Notwithstanding and prevailing over any contrary provision in this Agreement, any County or City covenant or obligation that may be contained in this Agreement shall not bind the Board, the County's Planning and Zoning Department, DERM, the Commission or any other County, City, federal or state department or authority, committee or agency to grant or leave in effect any zoning changes, variances, permits, waivers, contract amendments, or any other approvals that may be granted, withheld or revoked in the discretion of the County or City or other applicable governmental agencies in the exercise of its police power.

21.    **Force Majeure**.    If any Party shall be delayed in the performance of any obligation hereunder as a result of a Force Majeure, then the performance of such obligation shall be extended by the length of such delay. In response to and during any delay caused by a Force Majeure, the Parties shall at all times act diligently and in good faith to bring about the termination or removal of the Force Majeure as promptly as reasonably possible and any party seeking an excuse of performance due to such Force Majeure shall work diligently and in good faith to reduce or eliminate any damage, cost or delay caused by such Force Majeure. Without limiting the foregoing, if a Party fails to meet a deadline specified in this Agreement due to another Party's failure to meet a prior and related deadline (or due to an event covered by Section 3.6(f) of the Construction Agreement), such subsequent deadline shall be extended by the number of days the delay was attributable to the prior deadline failure, and the Party failing to meet the prior deadline shall not be relieved of liability for such breach.

22.    **Counterparts**.    If this Agreement is executed in several counterparts, each of those counterparts shall be deemed an original, and all of them together shall constitute one and the same instrument.

23.    **Rescission of Delegations**.    Notwithstanding and prevailing over anything to the contrary in this Agreement, the parties agree that the Board may at any time rescind any or all delegations of authority to the County Representative set forth in this Agreement. In such instances, the approval, consent or action sought shall be subject to approval by the Board and, if a time frame for the County Representative's approval, consent or action is set forth in this Agreement, the Board shall consider the matter no later than the 2nd regularly scheduled meeting

14

349

of the Board after committee consideration. All such time frames for County Representative approvals set forth in this Agreement shall be deemed amended accordingly.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement as of the date and year first above written.

CITY OF MIAMI, FLORIDA

By: _____
    Pedro G. Hernandez
    City Manager
    City of Miami

MIAMI-DADE COUNTY, FLORIDA

By: _____
    George M. Burgess
    County Manager
    Miami-Dade County

ATTEST:

By: _____
    _ City Clerk   4-10-09

ATTEST:

By: _____
    Clerk of the Board

APPROVED AS TO FORM AND
CORRECTNESS:

_____
    City Attorney _ _
    JULIE O. BRU

APPROVED AS TO INSURANCE
REQUIREMENTS:

_____
LeeAnn Brehm
Risk Management Director

APPROVED AS TO FORM AND
LEGAL SUFFICIENCY:

JRA for GBK
_____
    County Attorney

FLORIDA MARLINS, L.P.

By: Double Play Company,
    its General Partner

By: _____
    Name: DAVID P. SAMSON
    Title: President

16

350A



© Grant Thornton LLP
All rights reserved
U.S. member firm of Grant Thornton International Ltd